Stephanie **SANTIAGO**, an infant By her mother and natural guardian, Felicita **MUNIZ**, and Felicita Muniz, individually, Plaintiffs,

v.

Johnny **HERNANDEZ** and the City of New York, Defendants.

No. 97–CV–3201 FB.

United States District Court, E.D. New York.

April 29, 1999.

John M. Daly, Fitzgerald & Fitzgerald, P.C., Yonkers, NY, for the Plaintiffs.

Michael D. Hess, Corporation Counsel by Thomas G. Merrill, Assistant Corporation Counsel, The City of New York Law Department, New York City, for the Defendant City of New York.

Marc H. Pillinger, Smith, Mazure, Director & Wilkens, P.C., New York City, for the Defendant Johnny Hernandez.

### *MEMORANDUM AND ORDER*

BLOCK, District Judge.

Felicita Muniz ("Muniz") brings suit on behalf of herself and her minor child, Stephanie Santiago ("Santiago") (together, "plaintiffs") against the City of New York ("City") and Johnny Hernandez ("Hernandez"). Plaintiffs seek damages against the City for lead-based paint poisoning suffered by Santiago, based on alleged causes of action under the Lead-based Paint Poisoning and Prevention Act ("LPPPA"), 42 U.S.C. § 4822 *et seq.;* the Housing and Community Development Act ("HCDA"), 42 U.S.C. § 5301 *et seq.:* the LPPPA and HCDA regulations; 42 U.S.C. § 1983; and the New York City Administrative Code. Plaintiffs also seek damages against the City and Hernandez under an assortment of common law torts. After having removed the case from New York State Supreme Court, Kings County, *see* 28 U.S.C. § 1441, the City now moves to dismiss for

failure to state a claim under Fed.R.Civ.P. 12(b)(6), or alternatively, for summary judgment under Fed.R.Civ.P. 56. In their submissions in opposition to the City's motion, plaintiffs raise an additional claim under the Residential Lead-based Paint Hazard Reduction Act ("RLPHRA").[1]

As explained below, neither the LPPPA, the HCDA, the RLPHRA, nor their attendant regulations, provide plaintiffs with an enforceable right under 42 U.S.C. § 1983 or a private right of action against the City for its failure to cure the lead-based paint hazards in plaintiffs' home simply because the City was a recipient of federal funds designed to allow the City to address such hazards where found in pre–1978 privately owned residences. Therefore, the City cannot be liable to plaintiffs in a § 1983 action or a private right of action under these statutes or regulations for exposure to lead-based paint allegedly caused by the City's failure to properly attend to the lead-based paint hazards which it found to have existed in plaintiffs' apartment.

## I. BACKGROUND

In order to draw all inferences in favor of plaintiffs, *Vital v. Interfaith Medical Center,* 168 F.3d 615, 620 (2d Cir.1999), the following facts, most of which are undisputed, are drawn from the plaintiffs' submissions:[2]

Santiago was born in 1990, and lived with her mother, Muniz, at 362 48th Street, Apartment # 3, Brooklyn, New York from August 8, 1990 until April 19, 1996. They rented their apartment (the "Apartment") in Hernandez's apartment building, which was built prior to 1978. During March 1995, Santiago tested posi-

tive for an elevated level of lead in her blood, and the City was notified of the likelihood of the presence of lead-based paint hazards in the Apartment. Shortly thereafter, the City Department of Health ("DOH") inspected the Apartment and made the following findings: (1) Santiago, while living in the Apartment, had a blood lead level of 20 ug/dl or higher; (2) the paint at the Apartment contained sufficiently high levels of lead to violate the New York Health Code § 173.13(c) and (d); and (3) such conditions constituted a nuisance because they presented a danger to Santiago's life or health.

On April 13, 1995, DOH issued an "Order to Abate Nuisance" requiring Hernandez to remove all lead poisoning hazards from the Apartment. At least seven times between April and August 1995, City inspectors examined the Apartment for the presence of lead-based paint and provided lead hazard counseling to Muniz. Hernandez performed some repairs in the Apartment, but plaintiffs allege that they were insufficient to abate the lead-based paint hazards. Following a June 16, 1995 inspection, DOH referred the matter to the City's Emergency Repair Program of the Department of Housing Preservation and Development. Plaintiffs allege that the City never cured—that is, reduced, abated, and removed—the lead-based paint hazards in the Apartment.

Plaintiffs identify in their factual submissions three instances where the City allegedly spent Community Development Block Grant ("CDBG") funds provided by the federal Department of Housing and Urban Development ("HUD") that allegedly related to the Apartment: First, that

1. While plaintiffs did not specifically set forth their RLPHRA claim in their complaint, it is plausible to read this claim as a claim under the HCDA because the RLPHRA was enacted as Title X of the HCDA. *See* 42 U.S.C. § 4851 *et seq.* In any event, for purposes of the subject motion, the Court will deem plaintiff to have properly pleaded their RLPHRA claim.

2. These submissions are comprised of plaintiffs' Rule 56.1 Statement in Opposition to Summary Judgment; Declaration of Brian J. Farrell ("Farrell Dec."), with a stipulation between the City and plaintiffs regarding lead-based paint inspectors' salaries annexed thereto; Declaration of John M. Daly ("Daly Dec."), and supporting documents.

the City inspectors' salaries were paid by the City with CDBG funds. *See* Exhibit 10, attached to Farrell Dec. Second, that the City "applies for, receives, administers and uses grants of federal funds from HUD pursuant to the CDBG program for authorized CDBG purposes, including *inter alia,* ... prevention of lead-based paint poisoning." Daly Dec., ¶ 7. Third, that in 1995 the City received more than $207 million in CDBG funds for housing programs, Daly Dec., ¶ 89, causing plaintiffs to reason that "[i]f the City is spending enough of that two-hundred million dollars on administrative costs in running the lead-reduction programs, then some percentage of this money must be considered to be spent 'on' [the Apartment]." Pl. Mem., at 23. In addition, plaintiffs generally claim "that there are additional ways the City could spend CDBG money on [the Apartment]." Pl. Mem., at 23.

## II. DISCUSSION

### A. Summary Judgment

Fed.R.Civ.P. 12(b) provides, *inter alia:* "If, on a motion asserting the defense ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). In this action, the Court relies on facts set forth in the plaintiffs' submissions in opposition to summary judgment, including the stipulation entered into between the City and plaintiffs, which are outside the pleadings. Accordingly, the Court will treat the motion as one for summary judgment.

Plaintiffs have had adequate notice and a reasonable opportunity to oppose the summary judgment aspect of the City's motion. *See Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998) (no prejudice to plaintiff when court converted motion to dismiss to motion for summary judgment when defendant had moved for summary judgment in the alternative, and plaintiff had adequate time to respond); *National Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Lab., Div. of Am. Home Prods. Corp.,* 850 F.2d 904, 911 (2d Cir.1988) (same). Furthermore, plaintiffs have fully responded to the City's request for summary judgment. *See Groden v. Random House, Inc.,* 61 F.3d 1045, 1052–53 (2d Cir.1995) (district court's conversion of motion to dismiss to motion for summary judgment was proper when moving party asked for such relief in the alternative and opposing party presented evidence outside of the pleadings).

### B. Conceptual Overview: Enforceable Rights Under § 1983 and Private Rights of Action

"A plaintiff alleging a violation of a federal statute [or right] will be permitted to sue under § 1983 unless (1) 'the [statutory right does] not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the [statutory right] in the enactment itself.'" *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 508, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (quoting *Wright v. Roanoke Redevelopment & Housing Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987)). Under *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997), three factors must be present in order for a court to determine that a statutory provision creates a privately enforceable right under § 1983:

First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must impose a binding obligation on the States. In other words, the provision giving rise to the

asserted right must be couched in mandatory rather than precatory terms.

*Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353 (citations omitted).

Under *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), when determining whether a statute gives rise to a private right of action, the following four factors are to be considered:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted,—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort,* 422 U.S. at 78, 95 S.Ct. 2080 (citations and quotations omitted). In *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Supreme Court stated that the "central inquiry" of the *Cort* test is "whether Congress intended to create, either expressly or by implication, a private cause of action." *See Schuloff v. Queens College Foundation, Inc.,* 994 F.Supp. 425, 427 (E.D.N.Y.1998), *aff'd,* 165 F.3d 183 (2d Cir. 1999).

■ The *Cort* test "reflects a concern, grounded in separation of powers, that Congress rather than the courts control the availability of remedies for violations of statues." *Wilder,* 496 U.S. at 509 n. 9, 110 S.Ct. 2510. By contrast, those seeking to enforce a federal statute through § 1983 are relieved of the burden of establishing that Congress intended to provide them with a private remedy "[b]ecause § 1983 provides 'alternative sources of express congressional authorization of private suits.'" *Id.* (citing *Middlesex County*

*Sewage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 9, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981)). Specifically, because Congress is assumed to legislate against the background of § 1983, "these separation-of-powers concerns are not present in a § 1983 case." *Id.*

■ Nonetheless, although "the *Cort* test is distinct from the section 1983 test[,] ... there is a connection between the two tests." *Dumas v. Kipp,* 90 F.3d 386, 391 (9th Cir.1996). Both tests first ask whether a plaintiff is the intended beneficiary of a given statute. If a plaintiff fails to meet this intended beneficiary criterion, then the plaintiff does not have a federally enforceable right under § 1983 or a private right of action under the statute, and there is no need to consider the remaining *Blessing* or *Cort* factors. *See Suter v. Artist M.,* 503 U.S. 347, 364, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) (plaintiffs could bring neither § 1983 action nor private right of action where Congress did not create a federally enforceable right under the Adoption Assistance and Child Welfare Act); *King v. Town of Hempstead,* 161 F.3d 112, 115 (2d Cir.1998) (dismissing § 1983 action because statute did not create federal right in favor of plaintiff); *Legal Servs. of N. Cal. v. Arnett,* 114 F.3d 135, 140 (9th Cir.1997) (dismissing § 1983 action by party which was not intended beneficiary of statute); *Dumas,* 90 F.3d at 390–91 (same); *Schuloff,* 994 F.Supp. at 428 ("As the Court has already determined that [the statute] does not create a private right of action, [the plaintiff] cannot look to § 1983 to enforce the provisions of [the statute].").

It is conceptually possible for a plaintiff who is the intended beneficiary of a statute to have a § 1983 action but not a private right of action, or vice versa, because the remaining *Blessing* or *Cort* factors may not be satisfied in a plaintiff's favor. For example, in *Chan v. City of New York,* 1 F.3d 96, 102–06 (2d Cir.1993), the Second Circuit affirmed the district court's deter-

mination that the plaintiffs did not have a private right of action under the HCDA because the statute included regulatory provisions through which their rights could be enforced. They could, however, bring their claims under § 1983 because "there was little doubt that laborers and mechanics [such as plaintiffs] are the intended beneficiaries of an obligation that is cast by [the statute] in mandatory terms and that is readily quantifiable by reference to a state benchmark as set by a federal official. There is no ambiguity." *Chan*, 1 F.3d at 104.[3] *See also Mallett v. Wisconsin Div. of Vocational Rehab.*, 130 F.3d 1245, 1248–57 (7th Cir.1997) (determining that plaintiff could bring § 1983 claim because the Rehabilitation Act created an enforceable right in plaintiff and did not foreclose such relief, but that plaintiff did not have private right of action under Act because its language and legislative history suggested that statute's administrative remedy was a more appropriate enforcement mechanism); *Keaukaha–Panaewa Comm. Ass'n v. Hawaiian Homes Comm'n*, 739 F.2d 1467, 1470–71 (9th Cir. 1984) (plaintiffs could bring § 1983 action because statute clearly mandated that trust be established for benefit of Hawaiians such as plaintiffs and did not foreclose § 1983 remedy, but they did not have private right of action when legislative history suggested that Congress did not intend to create one); *Roman v. Morace*, No. 97–CV–341, 1997 WL 777844, at **3–13 (S.D.N.Y. Dec. 16, 1997) (plaintiffs could bring § 1983 action as the intended beneficiaries of statutes that required defendant to perform specific duties for plaintiffs' benefit, but could not sue directly under statutes because statutes' legislative history and text did not indicate Congressional intent to create a private cause of action).

Conversely, in *Bruneau v. South Kortright Central School District*, 163 F.3d 749, 756–59 (2d Cir.1998), the Second Cir-

cuit held that because Title IX implicitly provided a scheme for equitable relief and compensatory damages, the plaintiff had a private right of action under Title IX, but she could not bring her claims under § 1983 because the statute's language and complex administrative enforcement mechanism suggested that Congress sought to foreclose such relief. *See also Lile v. University of Iowa Hosp. & Clinics*, 674 F.Supp. 288, 290–91 (S.D.Iowa 1987) (Hill Burton Act implicitly contained a private right of action but its administrative scheme foreclosed § 1983 relief).

## C. Application

In the present case, plaintiffs are not the intended beneficiaries of the LPPPA, HCDA or RLPHRA or their regulations; thus, under *Blessing*, they may not bring a § 1983 action, and under *Cort*, they do not have a private right of action. Even if they were the intended beneficiaries of the HCDA and RLPHRA, they nonetheless have failed to satisfy *Blessing* and *Cort*.

### a. LPPPA Statute

Under the LPPPA, the Secretary of HUD is required to establish regulations

to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or *housing assistance payments under a program administered by the Secretary* or otherwise receives more than $5,000 in project-based assistance under a Federal housing program. Beginning on January 1, 1995, *such procedures shall apply to all such housing that constitutes target housing*, as defined in section 4851b of this title, and shall provide for appropriate measures

---

**3.** The portion of the HCDA relied upon by the *Chan* plaintiffs, which provided for public contractors to pay prevailing wage to all laborers and mechanics, is unrelated to that

portion of the HCDA relied upon by plaintiffs in the present case. *See Chan*, 1 F.3d at 98 (invoking 42 U.S.C. § 5310).

to conduct risk assessments, inspections, interim controls, and abatement of lead-based paint hazards.

42 U.S.C. § 4822(a)(1) (emphasis added).

As stated in 42 U.S.C. § 4851b(27), "target housing" is "any housing constructed prior to 1978", which includes plaintiffs' Apartment, with certain limited exceptions not here entailed. Plaintiffs argue that under 42 U.S.C. § 4822(a)(1), lead-based paint regulations must be promulgated for all target housing. However, this statute, by its express terms, clearly states that only "target housing," "which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise receives more than $5,000 in project-based assistance under a Federal housing program." comes within the statute's scope.

■ Plaintiffs contend, nonetheless, that the Apartment is covered by "housing assistance payments under a program administered by the Secretary," 42 U.S.C. § 4822(a)(1), because the City spent CDBG funds on inspecting the Apartment.[4] None of the lead-based paint statutes or their attendant regulations define the phrase "housing assistance payments." A review of federal housing statutes and regulations indicates that the "housing assistance payments" mentioned in 42 U.S.C. § 4822(a)(1) refer to rental assistance payments, and not to any CDBG lead-based paint expenditures. See 42 U.S.C. § 1437f (commonly referred to as the § 8 HUD housing program) (§ 8 program provides "low-income housing assistance" by making "assistance payments" to low-income persons to pay their rents); 42 U.S.C. § 11405a (§ 8 refers to "housing assistance" as part of its rental assistance pay-

ment program); 24 C.F.R. § 887.7 ("*Housing assistance payment.* The monthly payment made by the [Public Housing Authority] to an owner on behalf of a family participating in the Housing Voucher Program."); *see also* 24 C.F.R. §§ 880.501 (federal rental assistance program), 883.602 (same), 982.514 (same), 983.260 (same).

■ Because plaintiffs' Apartment did not come within the scope of 42 U.S.C. § 4822(a)(1), plaintiffs cannot rely upon this portion of the statute to establish that they are the intended beneficiaries of the LPPPA. Plaintiffs therefore cannot bring a § 1983 action and do not have a private right of action against the City under the LPPPA. In any event, even if plaintiffs were the intended beneficiaries of the LPPPA, the statute is directed to the Secretary of HUD, and not to any municipal official or municipality. Therefore, the statute makes clear that Congress did not intend the City to owe a binding obligation under the LPPPA to plaintiffs, as is required to satisfy *Blessing. See Resident Council of Allen Parkway Village v. HUD,* 980 F.2d 1043, 1053 (5th Cir.1993) (statute requiring HUD to act was not enforceable against local housing authority); *Stowell v. Ives,* 976 F.2d 65, 69 (1st Cir.1992) (statute requiring Secretary of Health and Human Services to act was not enforceable against state because it did not impose binding obligation on state).

Plaintiffs argue that *German v. Federal Home Loan Mortgage Corp.,* 885 F.Supp. 537, 572–77 (S.D.N.Y.1995), *on reargument,* 896 F.Supp. 1385 (S.D.N.Y.1995), supports the proposition that the CDBG program is a "housing assistance payments" program administered by the Sec-

---

**4.** Plaintiffs do not contend that the Apartment was "covered by an application for mortgage insurance" or that their housing received "project-based assistance." The term "project-based assistance" is not defined in the LPPPA; however, in other housing statutes, the term refers to federal financial aid provided for housing projects, rather than for individual residences. *See* 42 U.S.C. § 1437f(f)(6), 1437p. Plaintiffs do not allege that they lived in such housing. The Court need not, therefore, decide whether a § 1983 claim or private right of action could be maintained if the Apartment was covered by "an application for mortgage insurance" or received "project-based assistance."

retary of HUD. Plaintiffs' reliance on this case is misplaced because the underlying facts in *German* were significantly different from those in the present case. In *German*, the plaintiffs sued the City in its capacity "as BD public housing authorit[y] that administer[s] federal funds to the dwelling units where plaintiffs reside." 896 F.Supp. at 1390. The court determined that the plaintiffs' residences were covered by "an application for mortgage insurance or housing assistance payments under a program administered by the Secretary of HUD" because they lived in HUD-associated housing which the City operated using § 8 and CDBG funds. *German*, 885 F.Supp. at 573–75. Therefore, the court held that the plaintiffs had a cognizable § 1983 claim under the LPPPA because they were its intended beneficiaries. In contrast, the plaintiffs in the present case did not live in such housing; therefore, they could not be the intended beneficiaries of 42 U.S.C. § 4822.[5]

The comparison between the present case and *German* points to the fact that cases which have recognized a cognizable § 1983 claim under the LPPPA involved plaintiffs living in federally funded public housing, or private housing supported with federal rental assistance payments, rather than plaintiffs living in private housing paid for with private funds, such as plaintiffs' Apartment. *Compare Roman*, 1997 WL 777844, at **1–2 (recognizing § 1983 action, but not private right of action, under LPPPA by beneficiaries of § 8 housing funds against City housing authority); *Simmons v. Charleston Housing Auth.*, 881 F.Supp. 225 (S.D.W.Va.1995) (§ 8 recipients' § 1983 claim under United States Housing Act and LPPPA survived motion to dismiss); *and Davis v. Philadelphia Housing Auth.*, 121 F.3d 92 (3d Cir.1997) (tenants in apartment formerly occupied by § 8 recipient came within zone of interests of LPPPA to satisfy standing requirements) *with Lindsay v. New York City*

*Housing Auth.*, No. 95–CV–3315, 1999 WL 104599 (E.D.N.Y. Feb.24, 1999) (dismissing § 8 recipients' City housing authority claims under LPPPA for lack of private right of action); *and Holloway v. Kemp*, No. 93–CV–3849, 1994 WL 313094 (E.D.Pa. June 22, 1994) (no private right of action exists under LPPPA). This distinction reflects Congress's public policy decision that in federally funded housing, lead-based paint hazard control be required, but that in private homes not paid for or supported by federal funding, it only be encouraged through the provision of discretionary funds.

### b.  LPPPA Regulations

Plaintiffs claim that the HCDA and LPPPA regulations, 24 C.F.R. part 35 and 24 C.F.R. § 507.608, respectively, "create a variety of directives, binding on the grantees of federal funds, which require the removal of lead-based paint from certain housing." Pl. Mem., at 14. It is an open question in the Second Circuit whether "a regulation, standing alone, is sufficient to create a federal right necessary for a § 1983 suit." *See King*, 161 F.3d at 115. In this case, the Court need not decide the issue as plaintiffs do not come within the scope of the LPPPA and HCDA regulations.

■ In respect to the LPPPA regulations, 24 C.F.R. § 570.608 was promulgated in order to implement the LPPPA "by establishing procedures to eliminate as far as practicable the hazards due to the presence of paint which may contain lead and to which children under seven years of age may be exposed in existing housing *which is rehabilitated with assistance provided under this part.*" 24 C.F.R. § 570.608 (emphasis added). Plaintiffs claim that rehabilitation subsumes inspection, and since the City inspected the Apartment, it was

---

5.  The Court need not decide whether it would agree with the holding in *German* that plaintiffs living in federally funded housing are

entitled to bring a § 1983 action under the LPPPA. *See German*, 885 F.Supp. at 572–77.

therefore "rehabilitated with assistance provided under this part."

The LPPPA clearly prescinds between rehabilitation and inspection; thus the fact that the Apartment was inspected by CDBG-funded inspectors does not mean that it was rehabilitated with CDBG funds. *See* 42 U.S.C. § 4822(a)(1)(C) (providing that inspections should be conducted *"prior* to federally-funded renovation or rehabilitation"); 24 C.F.R. § 570.608(c)(3)(i) ("The grantee shall inspect for defective paint surfaces in all units ... which are proposed for rehabilitation assistance."); *see also* 42 U.S.C. § 4851b(12) (defining "inspection" as "a surface-by-surface investigation to determine the presence of lead-based paint ... and the provision of a report explaining the results of the investigation"). Plaintiffs have not put forth evidence that the City engaged in any rehabilitation activity in the Apartment within the scope of 24 C.F.R. § 570.608(c)(5). Thus, plaintiffs are not the intended beneficiaries of these regulations.

### c. HCDA and RLPHRA Statutes

■ Under the HCDA, "Congress' goal was to create better cities for everyone, and improving conditions for those at the lower end of the economic scale was only one means, albeit a significant one, of achieving that goal." *Latinos Unidos de Chelsea En Accion (LUCHA) v. Secretary of HUD,* 799 F.2d 774, 776 (1st Cir.1986) (HCDA was not enacted for the "especial benefit" of minority, low-income plaintiffs; thus plaintiffs did not have a private right of action under statute). Under the RLPHRA, Congress sought, *inter alia,* to "develop a national strategy to build the infrastructure necessary to eliminate lead-based paint hazards in all housing as expeditiously as possible." 42 U.S.C. §§ 4851a(1). Thus, the HCDA and RLPHRA were intended to benefit. the general public, rather than a special class of persons. The Supreme Court has held that being a member of the general public is insufficient to satisfy the intended bene-

ficiary inquiry. *See California v. Sierra Club,* 451 U.S. 287, 293–94, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (citing *Cort,* 422 U.S. at 78, 80–82, 95 S.Ct. 2080); *see also Montauk–Caribbean Airways, Inc. v. Hope,* 784 F.2d 91, 97 (2d Cir.1986). Therefore, plaintiffs are not the intended beneficiaries of the HCDA and RLPHRA.

■ Even if plaintiffs were the statutes' intended beneficiaries, they nonetheless fail to satisfy *Cort* and *Blessing.* With regard to *Blessing,* plaintiffs cannot establish that the right they seek to enforce is not vague and amorphous. Under the HCDA, the federal government provides state and local governments with CDBG funds to develop viable urban communities by pursuing nine goals, including "the elimination of conditions which are detrimental to health, safety and public welfare, through code enforcement, demolition, interim rehabilitation assistance, and related activities." 42 U.S.C. § 5301(c)(2). Presumably, addressing lead-based paint issues falls within this provision, but nothing in the statute requires local governments to address each instance of lead contamination. A subsequent portion of the HCDA identifies 26 community development activities that are eligible for HCDA funding, including "lead-based paint hazard evaluation and reduction." 42 U.S.C. § 5305(a)(25). Plaintiffs argue that once the City accepted CDBG funds to help achieve these laudable goals, it became obligated to pursue each activity listed in the statute. Nothing in the statute mandates that a state or local government pursue any one of these 26 activities; thus, the right assertedly protected by the HCDA is so "vague and amorphous" that its enforcement would strain judicial competence. The HCDA therefore fails to meet the second prong of *Blessing.*

As for the RLPHRA, it provides for the federal government to make grants to local governments to conduct any of nine lead-based paint reduction activities, *see* 42 U.S.C. § 4852(e). including "the abatement of lead-based paint hazards in priority

housing." 42 U.S.C. § 4852(e)(3). The statute does not mandate that an RLPHRA-fund recipient engage in or provide all eligible housing with any particular lead-based paint reduction activity. As with the HCDA, the right assertedly protected by the RLPHRA is "vague and amorphous."

Applying the *Cort* test to the HCDA and the RLPHRA, the Court determines that plaintiffs do not have a private right of action under these statutes. A portion of the HCDA expressly provides an administrative enforcement scheme to address noncompliance for all community development programs, including CDBG funded programs. *See* 42 U.S.C. § 5311; 24 C.F.R. §§ 570.910–911, 982.406. This scheme supports a determination that Congress intended HUD to bear the primary responsibility for ensuring compliance with the HCDA, including the RLPHRA. Also, implying a private right of action would be inconsistent with the underlying purposes of the statutes. Allowing plaintiffs to recover monetary damages under the HCDA and RLPHRA would simply deplete funds which would otherwise be available for local initiatives to improve urban conditions and address lead-based paint on a broad scale. This could not be the consequence Congress intended by bestowing grant monies upon states and municipalities for such important public purposes.

Only the fourth *Cort* factor would favor plaintiffs. The federal government has demonstrated its desire to take a leadership role in urban redevelopment and lead-based paint reduction by enacting the HCDA and RLPHRA, suggesting that these efforts are not of primary or traditional concern to the states. This is not sufficient, however, to overcome the other factors weighing against the creation of a private right of action under these statutes.

#### d. HCDA Regulations

■ The HCDA regulations apply only to "HUD-associated housing." 24 C.F.R. § 35.20, which is defined as:

Any residential structure that is the subject of an application for mortgage insurance under the National Housing Act or *is proposed for the receipt of housing assistance payments under a program administered by the Secretary.* For purposes of this Subpart A, "HUD-associated housing" also includes any existing residential structure—

\* \* \* \* \* \*

(3) That is currently covered by mortgage insurance or a *contract for housing assistance payments.*

24 C.F.R. § 35.22 (emphasis added). Plaintiffs attempt to redefine "HUD-associated housing" as "housing where or to which a CDBG grantee uses or administers federal funds." Pl. Mem., at 12. The HCDA and its regulations do not provide any justification for such an expansive reading. As with the LPPPA, the HCDA and its regulations do not define the phrase "housing assistance payments," which, as explained above, undoubtedly refers to rental subsidies provided through federal programs; not to federal funds expended on lead-based paint activities. Thus, plaintiffs are not the intended beneficiaries of these regulations and cannot consequently bring a § 1983 action or private right of action under them.

#### D. Supplemental Jurisdiction

As a consequence of the dismissal of plaintiffs' federal claims against the City, only plaintiffs' state law claims against the City and Hernandez remain. The Court declines to exercise supplemental jurisdiction over these state claims. *See* 28 U.S.C. § 1367(c)(3); *Alger v. Ganick, O'Brien & Sarin,* 35 F.Supp.2d 148, 160 (D.Mass. 1999) (*sua sponte* declining to exercise supplemental jurisdiction over state law claims); *Salovaara v. Eckert,* No. 94–CV–3430, 1998 WL 276186, at *8 (S.D.N.Y. May 28, 1998) (same); *Ballard v. Equifax Check Servs., Inc.,* 186 F.R.D. 589, ——,

1999 WL 176503, at *9 (E.D.Cal. Feb.22, 1999) (*sua sponte* declining to exercise supplemental jurisdiction over state law counterclaims).

 When the district court declines to exercise jurisdiction over state law claims in a removed case, it has the discretion to dismiss the state law claims or to remand them to state court. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (implying that court has discretion to dismiss state law claims if it declines to exercise supplemental jurisdiction in a removed action); *Travelers Ins. Co. v. Keeling,* 996 F.2d 1485, 1490 (2d Cir.1993) (affirming district court's remand of state law claims after it declined to exercise supplemental jurisdiction); *Kramer v. Miller,* No. 94 Civ. 3439, 1997 WL 458756, at*7 (S.D.N.Y. Aug. 11, 1997) (remanding state law claims after dismissing federal claims); *Igolnikov v. Mallah Org.,* No. 92 Civ. 7199, 1993 WL 227769, at *3–*4 (S.D.N.Y. June 22, 1993) (Sotamayor, J.) (same); *St. George v. Mak,* 842 F.Supp. 625, 636 (D.Conn.1993) (Cabranes, J.) (declining to exercise supplemental jurisdiction and dismissing state law claims in removed action). The Court exercises its discretion to remand the state law claims to state court.

## III. CONCLUSION

The Court grants summary judgment in favor of defendants and dismisses plaintiffs' federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims, and remands them to the New York State Supreme Court, Kings County.

**SO ORDERED.**