# Hurt v. Philadelphia Housing Authority

*David J. Alexander,* for plaintiffs.
*Brian J. Slipakoff,* for defendant.

PAPALINI, *J.,* January 20, 2005—Defendant Philadelphia Housing Authority has filed a motion for partial summary judgment, contending that plaintiffs Harold Hurt Jr. and Philip Hurt have failed to set forth valid causes of action in their complaints alleging deprivation of their federal civil rights pursuant to 42 U.S.C. §1983. Defendant does not contest plaintiffs' state claims alleging negligence.

Plaintiffs are represented by David J. Alexander, Esquire, and defendant is represented by Brian J. Slipakoff, Esquire.

Both plaintiffs allege that, as minors, they were injured by exposure to lead-based paint. Plaintiff Harold Hurt Jr. asserts that this exposure occurred at 5532 Cambridge Street, Philadelphia, Pa., where he resided from 1985 to 1992, and that defendant was the owner, landlord or manager of that premises. Plaintiff Philip Hurt asserts that he was exposed at the same premises, where he resided from 1985 to 2000.

In Count IX of the complaint of Harold Hurt Jr. and Count II of the first amended complaint of Philip Hurt, they assert a cause of action for violation of the federal Civil Rights Act of 1871, 42 U.S.C. §1983. That Act provides:

"Section 1983. Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

In answer to a query from this court for copies of the applicable federal statutes and regulations upon which plaintiffs rely, Mr. Alexander responded on November 9, 2004, with a letter stating that, through pattern and practice, defendant failed to comply with federal law concerning elimination of the hazards of lead-based paint. He cited and attached the Lead-Based Paint Poisoning Prevention Act (LPPPA), 42 U.S.C. §§4822, 4841, 4842, 4846 and federal regulations codified at 24 C.F.R. §§965.701 through 965.711. Counsel mentioned the United States Housing Act of 1937, but did not attach a copy or even provide a citation, so we will not consider that statute.

## A. LPPPA

Plaintiffs cite the following statutory provision: 42 U.S.C. §§4822,[1] 4841,[2] 4842,[3] 4846.[4]

1. 42 U.S.C. §4822:
"(a) General requirements.
"(1) Elimination of hazards. The Secretary of Housing and Urban Development (hereafter in this section referred to as the secretary)

Over the years, there have been various cases deciding whether violation of the LPPPA supports a personal federal right, enforceable through a section 1983 action.

The following cases held that the LPPPA *does not* confer a personal federal right, enforceable through a sec-

---

shall establish procedures to eliminate as far as practicable the hazards of lead-based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the secretary or otherwise receives more than $5,000 in project-based assistance under a federal housing program. Beginning on January 1, 1995, such procedures shall apply to all such housing that constitutes target housing, as defined in section 1004 of the Residential Lead-Based Paint Hazard Reduction Act of 1992 [42 USCS §4851b], and shall provide for appropriate measures to conduct risk assessments, inspections, interim controls, and abatement of lead-based paint hazards. At a minimum, such procedures shall require—

"(A) the provision of lead hazard information pamphlets, developed pursuant to section 406 of the Toxic Substances Control Act [15 USCS §2685], to purchasers and tenants;

"(B) periodic risk assessments and interim controls in accordance with a schedule determined by the secretary, the initial risk assessment of each unit constructed prior to 1960 to be conducted not later than January 1, 1996, and for units constructed between 1960 and 1978—

"(i) not less than 25 percent shall be performed by January 1, 1998;

"(ii) not less than 50 percent shall be performed by January 1, 2000; and

"(iii) the remainder shall be performed by January 1, 2002;

"(C) inspection for the presence of lead-based paint prior to federally-funded renovation or rehabilitation that is likely to disturb painted surfaces;

"(D) reduction of lead-based paint hazards in the course of rehabilitation projects receiving less than $25,000 per unit in federal funds;

"(E) abatement of lead-based paint hazards in the course of substantial rehabilitation projects receiving more than $25,000 per unit in federal funds;

tion 1983 action: *Santiago v. Hernandez,* 53 F. Supp.2d 264 (E.D. N.Y. 1999); *Lindsay v. New York City Housing Authority,* 1999 U.S. Dist. Lexis 1893 (E.D. N.Y. 1999); *Holloway v. Kemp,* 1994 U.S. Dist. Lexis 8497

---

"(F) where risk assessment, inspection, or reduction activities have been undertaken, the provision of notice to occupants describing the nature and scope of such activities and the actual risk assessment or inspection reports (including available information on the location of any remaining lead-based paint on a surface-by-surface basis); and

"(G) such other measures as the secretary deems appropriate.

"(2) Additional measures. The secretary may establish such other procedures as may be appropriate to carry out the purposes of this section.

"(3) Disposition of federally owned housing.

"(A) Pre-1960 target housing. Beginning on January 1, 1995, procedures established under paragraphs (1) and (2) shall require the inspection and abatement of lead-based paint hazards in all federally owned target housing constructed prior to 1960.

"(B) Target housing constructed between 1960 and 1978. Beginning on January 1, 1995, procedures established under paragraphs (1) and (2) shall require an inspection for lead-based paint and lead-based paint hazards in all federally owned target housing constructed between 1960 and 1978. The results of such inspections shall be made available to prospective purchasers, identifying the presence of lead-based paint and lead-based paint hazards on a surface-by-surface basis. The secretary shall have the discretion to waive the requirement of this subparagraph for housing in which a federally funded risk assessment, performed by a certified contractor, has determined no lead-based paint hazards are present.

"(C) Budget authority. To the extent that subparagraphs (A) and (B) increase the cost to the government of outstanding direct loan obligations or loan guarantee commitments, such activities shall be treated as modifications under section 504(e) of the Federal Credit Reform Act of 1990 and shall be subject to the availability of appropriations. To the extent that paragraphs (A) and (B) impose additional costs to the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, its requirements shall be carried out only if appropriations are provided in advance in an appropriations Act. In the absence of appropriations sufficient to cover the costs of subparagraphs (A)

(E.D. Pa. 1994); *Roseberry v. United States,* 736 F. Supp. 408 (D.N.H. 1990).[5]

The following cases held that the LPPPA *does* confer a personal federal right, enforceable through a section

---

and (B), these requirements shall not apply to the affected agency or agencies.

"(D) Definitions. For the purposes of this subsection, the terms 'inspection,' 'abatement,' 'lead-based paint hazard,' 'federally owned housing,' 'target housing,' 'risk assessment,' and 'certified contractor' have the same meaning given such terms in section 1004 of the Residential Lead-Based Paint Hazard Reduction Act of 1992 [42 USCS §4851b].

"(4) Definitions. For purposes of this subsection, the terms 'risk assessment,' 'inspection,' 'interim control,' 'abatement,' 'reduction,' and 'lead-based paint hazard' have the same meaning given such terms in section 1004 of the Residential Lead-Based Paint Hazard Reduction Act of 1992 [42 USCS §4851b].

"(b) Measurement criteria. The procedures established by the secretary under this section for the risk assessment, interim control, inspection, and abatement of lead-based paint hazards in housing covered by this section shall be based upon guidelines developed pursuant to section 1017 of the Residential Lead-Based Paint Hazard Reduction Act of 1992 [42 USCS §4852c].

"(c) Inspection requirements. The secretary shall require the inspection of all intact and nonintact interior and exterior painted surfaces of housing subject to this section for lead-based paint using an approved x-ray fluorescence analyzer, atomic absorption spectroscopy, or comparable approved sampling or testing technique. A certified inspector or laboratory shall certify in writing the precise results of the inspection. If the results equal or exceed a level of 1.0 milligrams per centimeter squared or 0.5 percent by weight, the results shall be provided to any potential purchaser or tenant of the housing. The secretary shall periodically review and reduce the level below 1.0 milligram per centimeter squared or 0.5 percent by weight to the extent that reliable technology makes feasible the detection of a lower level and medical evidence supports the imposition of a lower level. The requirements of this subsection shall apply as provided in subsection (d).

1983 action: *German v. Federal Home Loan Mortgage Corp.,* 1999 U.S. Dist. Lexis 19029 (S.D. N.Y. 1999), certified for interlocutory appeal at 2000 U.S. Dist. Lexis 10057 (S.D. N.Y. 2000); *Aristil v. The Housing Author-*

---

"(d) Abatement required.

"(1) Transitional testing and abatement in public housing receiving modernization assistance. In the case of public housing assisted with capital assistance provided under section 9 of the United States Housing Act of 1937 [42 USCS §1437g], the secretary shall require the inspection described in subsection (c) for—

"(A) a random sample of dwellings and common areas in all public housing projects assisted under such section; and

"(B) each dwelling in any public housing project in which there is a dwelling determined under subparagraph (A) to have lead-based paint hazards, except that the secretary shall not require the inspection of each dwelling if the secretary requires the abatement of the lead-based paint hazards for the surfaces of each dwelling in the public housing project that correspond to the surfaces in the sample determined to have such hazards under subparagraph (A).

"The secretary shall require the inspection of all housing subject to this paragraph in accordance with the modernization schedule. A public housing agency may elect to test for lead-based paint using atomic absorption spectroscopy and may elect to abate lead-based paint and dust containing lead under standards more stringent than that in subsection (c), including the abatement of lead-based paint and dust which exceeds the standard of lead permitted in paints by the Consumer Product Safety Commission under this Act [42 USCS §4801 et seq.], and such abatement shall qualify for capital assistance under section 9 of the United States Housing Act of 1937 [42 USCS §1437g]. The secretary shall require abatement of lead-based paint and lead-based paint hazards in housing in which the test results equal or exceed the standard established by or under subsection (c). Final inspection and certification after abatement shall be made by a qualified inspector, industrial hygienist, or local public health official.

"(2) HUD-owned properties.

"(A) Abatement demonstration program. In carrying out the requirements of this subsection with respect to single-family and multifamily properties owned by the Department of Housing and Urban Development and public housing, the secretary shall utilize a sufficient variety

*ity of the City of Tampa,* 54 F. Supp.2d 1289 (M.D. Fla. 1999); *Roman v. Morace,* 1997 U.S. Dist. Lexis 19926 (S.D. N.Y. 1997);[6] *Simmons v. Charleston Housing Authority,* 881 F. Supp. 225 (S.D. W.Va. 1995); *Hurt v. Philadelphia Housing Authority,* 806 F. Supp. 5151 (E.D.

---

of abatement methods in a sufficient number of areas and circumstances to demonstrate their relative cost-effectiveness and their applicability to various types of housing. For purposes of the demonstration, a public housing agency may elect to test for lead-based paint using atomic absorption spectroscopy and may elect to abate lead-based paint and dust containing lead under standards more stringent than that in subsection (c), including the abatement of lead-based paint and dust which exceeds the standard of lead permitted in paints by the Consumer Product Safety Commission under this Act [42 USCS §4801 et seq.], and such abatement shall qualify for assistance under section 14 of the United States Housing Act of 1937.

"(B) Report. Not later than 18 months after the effective date of the regulations issued to carry out this subsection, the secretary shall transmit to the Congress the findings and recommendations of the secretary as a result of the demonstration program, including any recommendations of the secretary for legislation to revise the requirements of this subsection. Based on the demonstration, the secretary shall prepare and include in the report a comprehensive and workable plan for the cost-effective inspection and abatement of public housing in accordance with paragraph (3), including an estimate of the total cost of abatement in accordance with paragraph (3)(B). In preparing such report, the secretary shall examine—

"(i) the most reliable technology available for detecting lead-based paint, including X-ray fluorescence and atomic absorption spectroscopy;

"(ii) the most efficient and cost-effective methods for abatement, including removal, containment, or encapsulation of the contaminated components, procedures which minimize the generation of dust (including the high efficiency vacuum removal of leaded dust), and procedures that provide for offsite disposal of the removed components, in compliance with all applicable regulatory standards and procedures;

"(iii) safety considerations in testing, abatement, and worker protection;

▪▪▪▪▪▪▪▪▪▪  ▪▪▪▪▪

Pa. 1992);[7] *Perry v. Housing Authority of the City of Charleston,* 664 F.2d 1210 (4th Cir. 1981).

All of the above cases preceded two United States Supreme Court cases in which the court clarified what

---

"(iv) the overall accuracy and reliability of laboratory testing of physical samples, x-ray fluorescence machines, and other available testing procedures;

"(v) availability of qualified samplers and testers;

"(vi) an estimate of the amount, characteristics, and regional distribution of housing in the United States that contains lead-based paint hazards at differing levels of contamination; and

"(vii) the merits of an interim containment protocol for public housing dwellings that are determined to have lead-based paint hazards but for which comprehensive improvement assistance under section 14 of the United States Housing Act of 1937 is not available.

"(3) Testing and abatement of other public housing.

"(A) Required inspection. The secretary shall require the inspection described in subsection (c) for—

"(i) a random sample of dwellings and common areas in all public housing that is not subject to paragraph (1); and

"(ii) each dwelling in any public housing project in which there is a dwelling determined under clause (i) to have lead-based paint hazards, except that the secretary shall not require the inspection of each dwelling if the secretary requires the abatement of the lead-based paint hazards for the surfaces of each dwelling in the public housing project that correspond to the surfaces in the sample determined to have such hazards under clause (i).

"(B) Schedule. The secretary shall require the inspection of all housing subject to this paragraph prior to the expiration of five years after the report is required to be transmitted under paragraph (2)(B). The secretary may prioritize, within such five-year period, inspections on the basis of vacancy, age of housing, or projected modernization or rehabilitation. The secretary shall require abatement and final inspection and certification of such housing in accordance with the last two sentences of paragraph (1).

"(4) Report required. Not later than nine months after completion of the demonstration required by paragraph (2), the secretary shall, based on the demonstration, prepare and transmit to the Congress, a comprehensive and workable plan, including any recommendations

was necessary to establish a personal federal right, enforceable through a section 1983 action: *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d

---

for changes in legislation, for the prompt and cost effective inspection and abatement of privately owned single family and multifamily housing, including housing assisted under section 8 of the United States Housing Act of 1937 [42 USCS §1437f]. After the expiration of the nine-month period referred to in the preceding sentence, the secretary may not obligate or expend any funds or otherwise carry out activities related to any other policy development and research project until the report is transmitted.

"(e) Exceptions. The provisions of this section shall not apply to—

"(1) housing for the elderly or handicapped, except for any dwelling in such housing in which any child who is less than seven years of age resides or is expected to reside;

"(2) any project for which an application for insurance is submitted under section 231, 232, 241, or 242 of the National Housing Act [12 USCS §§1715v, 1715w, 1715z-6, or 1715z-7]; or

"(3) any zero-bedroom dwelling.

"(f) Funding. The secretary shall carry out the provisions of this section utilizing available federal funding sources. The secretary shall use funds available under the Capital Fund under section 9 of the United States Housing Act of 1937 [42 USCS §1437g] to carry out this section in public housing. The secretary shall submit annually to the Congress an estimate of the funds required to carry out the provisions of this section with the reports required by paragraphs (2)(B) and (4).

"(g) Interpretation of section. This section may not be construed to affect the responsibilities of the Environmental Protection Agency with respect to the protection of the public health from hazards posed by lead-based paint.

"History:

"(Jan. 13, 1971, P.L. 91-695, title III, §302, as added Nov. 9, 1973, P.L. 93-151, §4(a)(1), 87 stat. 566; Feb. 5, 1988, P.L. 100-242, title V, subtitle C, §566(a), 101 stat. 1945; Act Nov. 7, 1988, P.L. 100-628, title X, subtitle E, §1088(a)-(f), (h), 102 stat. 3280; Oct. 28, 1992, P.L. 102-550, title X, subtitle A, §§1012(a)-(d), 1013, 106 stat. 3904, 3907; Oct. 21, 1998, P.L. 105-276, title V, subtitle B, part 1, §522(a)(4), 112 stat. 2564.)"

517 (2001),[8] and *Gonzaga University v. Doe,* 535 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).[9]

In *Alexander v. Sandoval,* the court said:

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Con-

---

2. Section 4841. Definitions

"As used in this Act [42 USCS §4801 et seq.]—

"(1) The term 'state' means the several states, the District of Columbia, the Commonwealth of Puerto Rico, and the territories and possessions of the United States.

"(2) The term 'units of general local government' means (A) any city, county, township, town, borough, parish, village, or other general purpose political subdivision of a state, (B) any combination of units of general local government in one or more states, (C) an Indian tribe, or (D) with respect to lead-based paint poisoning elimination activities in their urban areas, the territories and possessions of the United States.

"(3)(A) Except as provided in subparagraph (B), the term 'lead-based paint' means any paint containing more than five-tenths of 1 per centum lead by weight (calculated as lead metal) in the total nonvolatile content of the paint, or the equivalent measure of lead in the dried film of paint already applied, or both.

"(B)(i) The Consumer Product Safety Commission shall, during the six-month period beginning on the date of the enactment of the National Health Promotion and Disease Prevention Act of 1976, determine, on the basis of available data and information and after providing opportunity for an oral hearing and considering recommendations of the Secretary of Health, Education and Welfare (Secretary of Health and Human Services) (including those of the Centers for Disease Control and Prevention) and of the National Academy of Sciences, whether or not a level of lead in paint which is greater than six one-hundredths of 1 per centum but not in excess of five-tenths of 1 per centum is safe. If the commission determines, in accordance with the preceding sentence, that another level of lead is safe, the term 'lead-based paint' means, with respect to paint which is manufactured after the expiration of the six-month period beginning on the date of the commission's determination, paint containing by weight (calculated as lead metal) in the total nonvolatile content of the paint more than

gress. . . . The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy. . . . Statutory intent on this latter point is deter-

---

the level of lead determined by the commission to be safe or the equivalent measure of lead in the dried film of paint already applied, or both.

"(ii) Unless the definition of the term "lead-based paint" has been established by a determination of the Consumer Product Safety Commission pursuant to clause (i) of this subparagraph, the terra 'lead-based paint' means, with respect to paint which is manufactured after the expiration of the 12-month period beginning on such date of enactment, paint containing more than six one-hundredths of 1 per centum lead by weight (calculated as lead metal) in the total nonvolatile content of the paint, or the equivalent measure of lead in the dried film of paint already applied, or both.

"History:

"(Jan. 13, 1971, P.L. 91-695, title V, §501, 84 stat. 2080; Nov. 9, 1973, P.L. 93-151, §6, 87 stat. 567; June 23, 1976, P.L. 94-317, title II, §204(c), 90 stat. 706; Oct. 27, 1992, P.L. 102-531, title III, §312(g), 106 stat. 3506.)"

3. Section 4842. Consultation by secretary with other departments and agencies

"In carrying out their respective authorities under this Act (42 USCS §4801 et seq.), the Secretary of Housing and Urban Development and the Secretary of Health, Education, and Welfare (Secretary of Health and Human Services) shall each cooperate with and seek the advice of the heads of any other departments or agencies regarding any programs under their respective responsibilities which are related to, or would be affected by, such authority.

"History:

"(Jan. 13, 1971, P.L. 91-695, title V, §502, 84 stat. 2080; June 23, 1976, P.L. 94-317, title II, §204(d), 90 stat. 706.)"

4. Section 4846. State laws superseded, and null and void

"It is hereby expressly declared that it is the intent of the Congress to supersede any and all laws of the states and units of local government insofar as they may now or hereafter provide for a requirement, prohibition, or standard relating to the lead content in paints or other similar surface-coating materials which differs from the provisions of

minative. . . . Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. . . . 'Raising up causes of action where a statute has not created them may be a proper function for

this Act or regulations issued pursuant to this Act (42 USCS §4801 et seq.). Any law, regulation, or ordinance purporting to establish such different requirement, prohibition, or standard shall be null and void.
"History:
"(Jan. 13, 1971, P.L. 91-695, title V, §504 (506), as added Nov. 9, 1973, P.L. 93-151, §7(e), 87 stat 567; Nov. 10, 1978, P.L. 95-626, title II, §208(b), 92 stat. 3588)."
5. See also, *Banks v. Dallas Housing Authority*, 271 F.3d 605 (5th Cir. 2001), in which the court held that there was no section 1983 cause of action pursuant to the Housing Act of 1937, 42 U.S.C.S. §1437f(e).
6. The court held that there is a cause of action but dismissed the plaintiffs' complaint for failing to allege that there was a deliberate deprivation of federal rights pursuant to a municipal custom or policy.
7. This was a class action on behalf of persons living in public housing in Philadelphia who had been exposed to lead-based paints. Although the court held that the case could proceed pursuant to a section 1983 claim against the Philadelphia Housing Authority for both injunctive relief and monetary damages, at a later point in the litigation, the claim for monetary damages was dropped. The class action was provisionally certified for declaratory and injunctive relief at 151 F.R.D. 555 (E.D. Pa. 1993).
8. The court held that there was no private right of enforcement, where the Alabama Department of Public Safety administered the state driver's license examination only in English, in violation of title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq.
9. The court struck down an award of compensatory and punitive damages to the plaintiff, holding that there was no personal right to enforcement under the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. §1232g, which prohibits the federal funding of schools that have a practice or policy of permitting the release of students' educational records without their parents' consent.

common-law courts, but not for federal tribunals.' ... "
532 U.S. 286-87. (citations omitted)

In *Gonzaga University v. Doe,* the Supreme Court said:

"We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under section 1983. Section 1983 provides a remedy only for the deprivation of 'rights, privileges, or immunities secured by the constitution and laws' of the United States. Accordingly, it is rights, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section. This being so, we further reject the notion that our implied right of action cases are separate and distinct from our section 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under section 1983.

"We have recognized that whether a statutory violation may be enforced through section 1983 'is a different inquiry than that involved in determining whether a private right of action can be implied from a particular statute.' ... But the inquiries overlap in one meaningful respect—in either case we must first determine whether Congress *intended to create a federal right.* Thus we have held that 'the question whether Congress ... intended to create a private right of action [is] definitively answered in the negative' where 'a statute by its terms grants no private rights to any identifiable class.' ... For a statute to create such private rights, its text must be 'phrased in terms of the persons benefited.' ... But even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create

not just a private right but also a private remedy.'
*Alexander v. Sandoval,* 532 U.S. 275, 286, 149 L.Ed.2d
517, 121 S.Ct. 1511 (2001). . . ." 536 U.S. at 283-84.
(citations omitted)

Thus, in order for a person to proceed with a section
1983 action, a statute must confer a privately enforce-
able civil right, not just a benefit.

Cases after *Alexander v. Sandoval* and *Gonzaga Uni-
versity v. Doe,* have narrowly interpreted federal stat-
utes.[10]

We have reviewed the provisions of the LPPPA and
find that they include no rights-creating terms. Signifi-
cantly, the legislation requires the testing of paint, not
people.

Two federal districts courts in the Sixth Circuit, citing
both *Alexander v. Sandoval* and *Gonzaga University v.*

---

10. *E.g., Three Rivers Center for Independent Living Inc. v. Hous-
ing Authority of the City of Pittsburgh,* 382 F.3d 412 (3d Cir. 2004)
(the Rehabilitation Act of 1973, 29 U.S.C. §794(a) and regulations
promulgated thereunder, which require that there be accessible public
housing for handicapped persons, do not confer a private cause of
action directly or pursuant to section 1983); *Save Our Valley v. Sound
Transit,* 335 F.3d 932 (9th Cir. 2003) (the court rejected a claim that
title VI of the Civil Rights Act of 1964 and section 1983 conferred on
a community advocacy group the right to challenge the building of a
light rail line, on the theory that it would discriminate against resi-
dents on the basis of race); *Johnson v. Housing Authority of Jefferson
Parrish,* 2004 U.S. Dist. Lexis 21713 (E.D. La. 2004) (the court ruled
that it could not enforce a section 8 public housing program, the House
Choice Voucher program, 42 U.S.C. §1437(o), nor its implementing
regulations, through a section 1983 action); *Harris v. City of Chicago,*
2002 U.S. Dist. Lexis 16579 N.D. Ill. 2002) (the defendants' motion
to dismiss was granted where parents and their children attempted to
sue city, school, school district and personnel for harassment, inva-
sion of privacy, libel and slander, under section 1983).

*Doe,* have held that neither the text nor structure of the LPPPA supported a conclusion that Congress intended to create enforceable rights under section 1983, for children residing in public housing who are exposed to lead-based paint. *L.B. III v. Housing Authority of Louisville,* 2004 U.S. Dist. Lexis 23731 (W.D. Ky. 2004); *Johnson v. City of Detroit,* 319 F. Supp.2d 756 (E.D. Mich. 2004).

We find the reasoning in both of those cases persuasive, and reach the same conclusion.

## B. FEDERAL REGULATIONS

Plaintiffs have also cited 24 C.F.R. §965.701-.711.[11]

In *Alexander v. Sandoval, supra,* 532 U.S. at 289, the Supreme Court said that "Language in a regulation may invoke a private right of action that Congress through a

---

11. We note that 24 C.F.R. §965.701 was substantially revised in 1999 and the other sections cited by plaintiffs were then removed. 24 C.F.R. §965.701 now provides:

"Section 965.701 Lead-based paint poisoning prevention.

"The requirements of the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 4821-4846), the Residential Lead-Based Paint Hazard Reduction Act of 1992 (42 U.S.C. 4851-4856), and implementing regulations at part 35, subparts A, B, L, and R of this title apply to this program.

"History:

"[57 FR 28358, June 24, 1992; 64 FR 50140, 50229, Sept. 15, 1999]."

Part 35 is a compilation of rules relating to lead-based paint poisoning prevention in both private and public residential housing. Subpart A contains private enforcement provisions and provides for treble damages and fees (24 C.F.R. §35.96(c), (d)). But that section in subpart A implements a specific provision contained in the Residential Lead-Based Paint and Hazard Reduction Act of 1992, 42 U.S.C. §4852d(b)(3). Subparts B, L and R, which implement, inter alia, the LPPPA, contain no private enforcement provisions.

statutory text created, but it may not create a right that Congress has not." See *Johnson v. City of Detroit, supra; Save Our Valley v. Sound Transit, supra.*

Because we conclude that the LPPPA has no rights creating language, federal regulations relating to the LPPPA can create no such rights.

Our own review found that the housing quality standards (HQS) for assisted public housing does require that the provisions of the LPPPA be implemented by HUD and the Federal Housing Administration. See 24 C.F.R. §982.401(a)(2)(i)(I)(j).

However, in 1995, a provision was adopted at 24 C.F.R. §982.406, which provides:

"Part 982 does not create any right of the family, or any party other than HUD or the HA, to require enforcement of the HQS requirements by HUD or the HA, or to assert any claim against HUD or the HA, for damages, injunction or other relief, for alleged failure to enforce the HQS."

Although, section 982.406 was not in effect during most of the period of the plaintiffs' alleged exposure to lead-based paint, we conclude that it reveals an administrative conclusion that there was *never* an intent by Congress to create personal federal rights which could be enforced, when it enacted the LPPPA.

## C. CLAIM BASED ON VIOLATIONS OF U.S. CONSTITUTION

In a letter dated November 23, 2004, Mr. Alexander asserted that plaintiffs had a constitutionally guaranteed right to be secure in their person as a clearly established

constitutional right to liberty protected by the Fifth and Fourteenth Amendments to the United States Constitution. Plaintiffs cited numerous federal cases, none of which related to personal injury caused by the condition of public housing. Ten of the cases involved search and seizure, assault by police, or assault in a prison setting. The three others involved the denial of a promotion (the court found no section 1983 cause of action), seizure under an unconstitutional Mississippi replevin law and a school suspension case.

On this issue, we agree with the district court's opinion in *Hurt v. Philadelphia Housing Authority, supra,* 806 F. Supp. at 522-23. We conclude that plaintiffs did not have a right under the Fifth and Fourteenth Amendments to the United States Constitution to have the premises in which they *voluntarily* lived, be free of lead-based paint. They would only have a cause of action if they were in custodial care or had been forced by the Housing Authority to live at 5532 Cambridge Street.

## D. CONCLUSION

For the reasons set forth above, we are striking the federal civil rights claims of both plaintiffs for damages pursuant to 42 U.S.C. §1983.

However, because we conclude that the issue of whether plaintiffs have a viable civil rights claim under section 1983 "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from [this] order may materially advance the ultimate termination of this matter," we are sua sponte certifying this order for immediate interlocutory appeal pursuant to Pa.R.A.P. 1311

and 42 Pa.C.S. §702(b). Any party to this litigation may petition the appropriate appellate court to accept such an appeal.

## ORDER

And now, January 20, 2005, after consideration of defendant's motion for partial summary judgment and plaintiffs' responses thereto, it is hereby ordered and decreed that the motion is granted: With respect to C.P. 0307-0512, Count IX of the complaint, alleging violation of 42 U.S.C. §1983 is stricken with prejudice; with respect to C.P. 0405-2966, Count II of the first amended complaint, alleging violation of 42 U.S.C. §1983 is stricken with prejudice.

It is further ordered and decreed that this order is certified for immediate interlocutory appeal pursuant to Pa.R.A.P. 1311 and 42 Pa.C.S. §702(b), because we conclude that an issue in this case "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from [this] order may materially advance the ultimate termination of this matter. . . ."