RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0151p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DELLITA JOHNSON,

        *Plaintiff-Appellant,*

        *v.*

CITY OF DETROIT and CITY OF DETROIT HOUSING
COMMISSION,

        *Defendants-Appellees.*

No. 04-1817

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-74440—Robert H. Cleland, District Judge.

Argued: October 28, 2005

Decided and Filed: May 3, 2006

Before: MARTIN, GIBBONS, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. James D. Noseda, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees. **ON BRIEF:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. James D. Noseda, CITY OF DETROIT LAW DEPARTMENT, Detroit, Michigan, for Appellees.

      GRIFFIN, J., delivered the opinion of the court, in which GIBBONS, J., joined. MARTIN, J. (pp.14-16), delivered a separate opinion concurring in part, dissenting in part, and concurring in the judgment.

---

## OPINION

---

      GRIFFIN, Circuit Judge. Plaintiff Dellita Johnson, on behalf of her minor child, Jerome Johnson, Jr., appeals an order of the district court dismissing the claims she asserted against defendants City of Detroit ("City") and the City of Detroit Housing Commission ("DHC"), for the deprivation of federal rights ostensibly created by provisions of the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. §§ 4821-46 ("LBPPPA"), the United States Housing Act of 1937, as amended, 42 U.S.C. §§ 1437-1437bbb ("USHA"), and administrative regulations promulgated pursuant to those statutes. We affirm and hold that the LBPPPA, the USHA, and their

administrative regulations do not create individual federal rights enforceable under 42 U.S.C. § 1983.

I.

In August 2003, plaintiff filed the present action against the City and the DHC, seeking damages for lead-based paint poisoning allegedly suffered by her minor son, Jerome Johnson, Jr., while he was a tenant at the Jeffries Homes public housing project in Detroit, Michigan. Plaintiff and her son resided at the Jeffries Homes from 1988 until 1992.[1] During this relevant time period, the City, a "public housing agency" ("PHA"),[2] and the DHC, a department of the City, owned and operated the public housing project and received federal funding pursuant to Section 8 of the USHA, 42 U.S.C. § 1437f.

In her seven-count complaint, plaintiff alleges that, while a resident of the Jeffries Homes project, she complained to defendants' agents and employees about peeling, chipping, and flaking lead-based paint in and around her living unit, but that defendants failed to rectify the problem. Count I of the complaint alleges a cause of action for damages under 42 U.S.C. § 1983 for the deprivation of federal rights purportedly conferred by provisions of the USHA, the LBPPPA, and administrative regulations created under those statutes. Count II alleges "other violations of federal law," but it, too, is based on federal rights under the same statutes and regulations as described in Count I. Count III alleges a violation of an implied private right of action under the LBPPPA, and Count IV asserts a claim for breach of the annual contributions contract ("ACC") executed between the United States Department of Housing & Urban Development ("HUD") and the DHC, as a third-party beneficiary. Count V alleges breach of warranty of habitability in violation of Michigan Compiled Laws § 554.139. Counts VI and VII assert claims of common law negligence and nuisance per se, respectively.

Defendants filed a motion pursuant to FED. R. CIV. P. 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief can be granted. Following oral argument, the district court, on May 24, 2004, issued a comprehensive opinion and order, granting in part defendants' motion with regard to Counts I, II, and III of the complaint. *See Johnson v City of Detroit*, 319 F. Supp. 2d 756 (E.D. Mich. 2004). Specifically, the district court concluded that the relevant provisions of the USHA, the LBPPPA, and accompanying regulations did not confer personal federal rights on plaintiff, as a tenant of Section 8 housing, that could be enforced pursuant to § 1983. *Id.* at 763-79. In addition, the court held that the LBPPPA does not allow for an implied private right of action. *Id.* at 779 n.11. The district court dismissed all remaining supplemental state law claims (Counts IV-VII) under 28 U.S.C. § 1367 without prejudice. *Id.* at 781.

On June 8, 2004, plaintiff filed a motion to alter or amend judgment, and to amend the complaint to allege violations of plaintiff's Fifth and Fourteenth Amendment rights to substantive due process. The district court denied the motion by order entered on June 21, 2004.

On June 24, 2004, plaintiff filed a timely notice of appeal from both the judgment of May 24, 2004, granting in part defendants' motion to dismiss, and the order of June 21, 2004, denying plaintiff's motion to alter or amend the judgment and to amend the complaint.[3]

----

[1] Plaintiff alleges that her son, now eighteen years of age, was diagnosed with lead poisoning at the age of two.

[2] *See* 42 U.S.C. § 1437a(b)(6)(B) (defining a PHA).

[3] Although plaintiff filed a notice of appeal from both orders of the district court, plaintiff's brief on appeal is devoid of any argument pertaining to an appeal from the June 21, 2004, order denying its motion to alter or amend judgment, and to amend the complaint. This portion of the appeal is therefore deemed abandoned. *See Enertech Elec.,*

II.

We review a district court's dismissal of a complaint under Rule 12(b)(6) de novo. *Arrow v. Fed. Reserve Bank of St. Louis*, 358 F.3d 392, 393 (6th Cir. 2004). In order to survive a 12(b)(6) motion, the plaintiff's complaint must allege facts which, if proved, would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a motion to dismiss for failure to state a claim, we "construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true and determine whether the plaintiff can prove no set of facts in support of his claims that would entitle him to relief." *Arrow,* 358 F.3d at 393. "Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 468 (6th Cir. 2005).

III.

Plaintiff's claims that certain provisions of the LBPPPA and the USHA create individual federal rights enforceable under 42 U.S.C. § 1983 must be considered against the backdrop of recent developments in this area of jurisprudence.

Title 42 U.S.C. § 1983 creates a remedy for those denied "rights, privileges, or immunities secured by the Constitution *and laws.*" *Id*. (emphasis added). Federal statutes are clearly "laws" within the meaning of § 1983. *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 (1990); *Wright v. Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 423-24 (1987); *Maine v. Thiboutot*, 448 U.S. 1, 4-5 (1980). Section 1983 does not alone create substantive rights; rather, "§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e*., rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002).

In *Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997), the Supreme Court identified three factors pertinent to the determination whether a statute confers a viable § 1983 action: (1) Congress must have intended the provision to benefit the plaintiff; (2) the statute is not so "'vague and amorphous' that its enforcement would strain judicial competence"; and (3) the provision imposes a binding obligation on the state, i.e., it must be couched in mandatory, rather than precatory, terms. *Accord Westside Mothers v. Haveman*, 289 F.3d 852, 862-63 (6th Cir. 2002) (utilizing the *Blessing* test in a § 1983 action); *Clark v. Portage County, Ohio,* 281 F.3d 602, 603 (6th Cir. 2001) (applying the *Blessing* three-factor analysis to determine the viability of a § 1983 action).

Subsequently, however, in *Gonzaga,* the Supreme Court acknowledged that "[s]ome language in our opinions might be read to suggest that something less than an unambiguously conferred right is enforceable by § 1983." 536 U.S. at 282. Canvassing its prior decisions pertaining to § 1983, the Court noted that the *Blessing* decision, for example, had generated some confusion in its application because "[i]n the same paragraph [setting forth the three-factor inquiry], however, *Blessing* emphasizes that it is only violations of *rights*, not *laws*, which give rise to § 1983 actions." *Id*. at 282-83. The *Gonzaga* Court explained:

> This confusion has led some courts to interpret *Blessing* as allowing plaintiffs to enforce a statute under §1983 so long as the plaintiff falls within the general zone of

---

*Inc. v. Mahoning County Comm'rs*, 85 F.3d 257, 259 (6th Cir. 1996); FED. R. APP. P. 28(a)(9)(A) (requiring that the appellant's brief contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies. . . ."). Moreover, we note that plaintiff does not challenge on appeal the district court's dismissal of counts IV-VII of the complaint (the supplemental state law claims).

interest that the statute is intended to protect; something less than what is required for a statute to create rights enforceable directly from the statute itself under an implied right of action. Fueling this uncertainty is the notion that our private right of action cases have no bearing on the standard for discerning whether a statute creates rights enforceable by § 1983.

*Id.* at 283.

In order to allay this confusion, the *Gonzaga* Court soundly "reject[ed] the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983" and accentuated that "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of that section." *Id.* The *Gonzaga* Court "further reject[ed] the notion that our implied right of action cases are separate and distinct from our § 1983 cases. To the contrary, our implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id.* The inquiries, while separate and distinct,[4]

> overlap in one meaningful respect – in either case we must first determine whether Congress *intended to create a federal right*. Thus we have held that "the question whether Congress . . . intended to create a private right of action [is] definitively answered in the negative" where a "statute by its terms grants no private rights to any identifiable class." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). For a statute to create such private rights, its text must be "phrased in terms of the persons benefited." *Cannon v. University of Chicago*, 441 U.S. 677, 692, n.13, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). We have recognized, for example, that Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 create individual rights because those statutes are phrased "with an *unmistakable focus* on the benefited class." *Id.*, at 691, 99 S.Ct. 1946 (emphasis added).

\* \* \*

> A court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context. . . . Both inquiries simply require a determination as to whether or not Congress intended to confer individual rights upon a class of beneficiaries. . . . Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.

*Id.* at 283-86 (footnote omitted).

---

[4]The *Gonzaga* Court noted that implied private right of action cases are set apart from § 1983 cases in that:

[E]ven where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent "to create not just a private *right* but also a private *remedy*." *Alexander v. Sandoval*, 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (emphasis added).

[However], [p]laintiffs suing under § 1983 do not have the burden of showing an intent to create a private remedy because § 1983 generally supplies a remedy for the vindication of rights secured by federal statutes. Once a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable by § 1983.

*Id.* at 284 (internal citation omitted).

Applying these principles in the context of deciding whether a student may sue a private university for damages under § 1983 to enforce nondisclosure provisions of the Family Educational Rights and Privacy Act of 1974 ("FERPA"), 20 U.S.C. § 1232g, which prohibit the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons, the *Gonzaga* Court held that such an action was foreclosed because the relevant provisions of FERPA create no personal rights enforceable under § 1983.[5] In so holding, the Court determined that FERPA's nondisclosure provisions "contain no rights-creating language, they have an aggregate, not individual focus, and they serve primarily to direct the Secretary of Education's distribution of public funds to educational institutions."[6] *Id.* at 290. The Court noted that the FERPA nondisclosure provision was "a far cry from the sort of individualized, concrete monetary entitlement found enforceable in *Maine v. Thiboutot*, . . . , *Wright*, and *Wilder*. . . ." *Id.* at 288 n.6.

Thus, under *Gonzaga*, statutory language that merely "benefits" putative plaintiffs without specific rights-creating language is insufficient to confer a personal federal right enforceable under § 1983. *Id.* at 282. A plaintiff can no longer satisfy the first element of the *Blessing* test simply because he or she receives a benefit from the statute at issue or is within its zone of interest. Instead, under *Gonzaga's* more exacting standard, the text and structure of the statute in question must be examined to determine whether Congress intended to create a federal right; such a right must be gleaned from unambiguous, explicit rights-creating language that focuses on "rights," not broader or vaguer "benefits" or "interests." *Id.* at 283. "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons." *Id.* at 287 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)). "In sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and

---

[5]The pertinent section of FERPA at issue in *Gonzaga* provides:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein . . .) of students without the written consent of their parents to any individual, agency, or organization."

20 U.S.C. § 1232g(b)(1).

[6]Specifically, the Court stated:

> [T]here is no question that FERPA's nondisclosure provisions fail to confer enforceable rights. To begin with, the provisions entirely lack the sort of "rights-creating" language critical to showing the requisite congressional intent to create new rights. . . . Unlike the individually focused terminology of Titles VI and IX ("No person . . . shall . . . be subjected to discrimination"), FERPA's provisions speak only to the Secretary of Education, directing that "[n]o funds shall be made available" to any "educational agency or institution" which has a prohibited "policy or practice." 20 U.S.C. § 1232g(b)(1). This focus is two steps removed from the interests of individual students and parents and clearly does not confer the sort of "individual entitlement" that is enforceable under § 1983.

> * * *

> FERPA's nondisclosure provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. See §§ 1232g(b)(1)-(2) (prohibiting the funding of "any educational agency or institution which has a *policy or practice* of permitting the release of education records" (emphasis added)). Therefore, as in *Blessing*, they have an "aggregate" focus, 520 U.S. [329], at 343, . . . they are not concerned with "whether the needs of any particular person have been satisfied," *ibid.*, and they cannot "give rise to individual rights," *id.*, at 344.

536 U.S. at 287-88.

unambiguous terms – no less and no more than what is required for Congress to create new rights enforceable under an implied right of action." *Id.* at 290.

This Court has recognized that the *Gonzaga* decision has altered the landscape of § 1983 claims. The courts of this circuit have continued to apply the three-factor *Blessing* test, albeit acknowledging that *Gonzaga* clarified application of the first "benefit" factor and underscored that the central focus of this factor should be on whether the statutory provision contains "rights-creating" language critical to showing the requisite congressional intent to create new rights. *See*, *e.g.*, *Caswell v. City of Detroit Hous. Comm'n*, 418 F.3d 615, 618-20 (6th Cir. 2005); *Sandusky County Democratic Party v. Blackwell,* 387 F.3d 565, 572 (6th Cir. 2004); *Hughlett v. Romer-Sensky*, 98 F. App'x. 360, 365 n.3 (6th Cir. 2004) (unpublished); *Westside Mothers v. Olszewski*, 368 F. Supp. 2d 740, 746-49 (E.D. Mich. 2005); *L.B. III v. Hous. Auth. of Louisville*, 345 F. Supp. 2d 725, 727 (W.D. Ky. 2004); *Bosscher v. Twp. of Algoma*, 246 F. Supp. 2d 791, 798 (W.D. Mich. 2003).[7]

The district court in the instant case likewise was cognizant of the impact of *Gonzaga,* as reflected in its evaluation of plaintiff's § 1983 claims under the USHA and the LBPPPA. Indeed, in its thorough analysis using the "rights-creating" approach set forth in *Gonzaga*, the district court concluded that these federal statutes do not create federal rights enforceable by plaintiff under § 1983.[8] This assessment is supported by the specific text and structure of the statutes.

## IV.

The statutory provisions of the LBPPPA cited in plaintiff's complaint are 42 U.S.C. §§ 4801,[9] 4821, and 4822. Section 4821 provides the general mandate of the LBPPPA:

> (a) The Secretary of Housing and Urban Development, in consultation with the Secretary of Health and Human Services, shall develop and carry out a demonstration and research program to determine the nature and extent of the problem of lead based paint poisoning in the United States, particularly in urban areas, including the methods by which the lead based paint hazard can most effectively be removed from interior surfaces, porches, and exterior surfaces of residential housing to which children may be exposed.
>
> (b) The Chairman of the Consumer Product Safety Commission shall conduct appropriate research on multiple layers of dried paint film, containing the various lead components commonly used, in order to ascertain the safe level of lead in residential paint products. No later than December 31, 1974, the Chairman shall submit to Congress a full and complete report of his findings and recommendations as developed pursuant to such programs, together with a statement of any legislation

---

[7]*See also Sabree v. Richman,* 367 F.3d 180, 181-82 (3d Cir. 2004) (noting that *Gonzaga* has altered the inquiry regarding § 1983 actions); *Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57-58 (1st Cir. 2004) (concluding that *Gonzaga* compelled reexamination of § 1983 analysis); *31 Foster Children v. Bush*, 329 F.3d 1255, 1269-70 (11th Cir. 2003) (holding that *Gonzaga* clarified the first of the *Blessing* requirements, making it plain that only unambiguously conferred rights, as distinguished from mere benefits or interests, may be enforced under § 1983).

[8]Two recent cases have favorably cited the district court's opinion in the instant case in concluding that there is no actionable § 1983 claim under the LBPPPA. *See L.B. III,* 345 F. Supp. 2d at 727-28; *Hurt v. Philadelphia Hous. Auth.*, 70 Pa. D. & C.4th 142, 145-57 (C. P. Philadelphia County 2005).

[9]Section 4801 was repealed by the Health Servs. & Centers Amendments of 1978, Pub. L. No. 95-626, 92 Stat. 3588 (1978).

which should be enacted or any changes in existing law which should be made in order to carry out such recommendations.

42 U.S.C. § 4821(a)-(b).

Section 4822 further describes the requisite procedures to be implemented in light of § 4821(a)'s mandate:

(a) General requirements

(1) Elimination of hazards

The Secretary of Housing and Urban Development (hereafter in this section referred to as the "Secretary") shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by an application for mortgage insurance or housing assistance payments under a program administered by the Secretary or otherwise receives more than $5,000 in project-based assistance under a Federal housing program. Beginning on January 1, 1995, such procedures shall apply to all such housing that constitutes target housing . . . and shall provide for appropriate measures to conduct risk assessments, inspections, interim controls, and abatement of lead-based paint hazards.

42 U.S.C. § 4822(a)(1).

At a minimum, such procedures include: the provision of lead hazard information pamphlets to purchasers and tenants; periodic risk assessments and interim controls in accordance with a schedule determined by the Secretary of HUD; inspection for the presence of lead-based paint prior to federally-funded rehabilitation or renovation that is likely to disturb paint surfaces; the reduction and abatement of lead-based paint hazards in the course of rehabilitation projects; where risk assessment, inspection, or reduction activities have been undertaken, the provision of notice to occupants describing the nature and scope of such activities and the actual risk assessment or inspection reports (including available information on the location of any remaining lead-based paint on a surface-by-surface basis; and, such other additional measures as the Secretary deems appropriate. 42 U.S.C. §§ 4822(a)(1)(A)-(G). Section 4822 also requires the Secretary of HUD to ensure the inspection of all interior and exterior painted surfaces and describes specific inspection, abatement, and reporting requirements. *Id*. §§ 4822(c) and (d). The remaining subsections of § 4822 provide further specifics for the implementation of the described procedures. *Id*. §§ 4822(b)-(g).

The district court, reviewing this statutory language, concluded that the LBPPPA does not create federal rights in tenants of Section 8 housing that can be enforced pursuant to § 1983:

[T]he Plaintiff clearly falls within the broader class of beneficiaries who receive protection under the LBPPPA. However, the statutory language does not contain the sort of rights-creating language which reveals Congressional intent to create a federal right for tenants to enforce the procedures mandated by the statute. The statute focuses on the Secretary of HUD, the person being regulated, and not on the tenants as beneficiaries of express rights or entitlements. . . . The LBPPPA directs the Secretary to implement "procedures to eliminate as far as practicable the hazards of lead based paint poisoning." 42 U.S.C. § 4822. The statute's language does not unambiguously create new rights enforceable by Section 8 tenants under § 1983. Rather than expressly creating such rights, the LBPPPA grants administrative authority to the executive branch and mandates that the Secretary of HUD include

certain requirements relating to the provision of information to purchasers and tenants, periodic risk assessments, inspections, reductions, and abatement of lead-based paint hazards. *Id.* at § 4822(1)(A)-(G). The Act requires HUD to implement certain "procedures" for public housing agencies to follow. This language falls well short of unambiguously conferring individual rights on tenants who would benefit from the Secretary's procedures.

*Johnson*, 319 F. Supp. 2d at 767. We agree. Reviewing the pertinent sections of the LBPPPA within the parameters of *Gonzaga's* reconfigured § 1983 analysis, we cannot extrapolate an explicit congressional intent to create an entitlement in the LBPPPA enforceable by a tenant under § 1983.

Plaintiff argues that children like Jerome, who live in federally funded low income housing, are the primary intended beneficiaries of the LBPPPA and that the LBPPPA was enacted for the very purpose of protecting children in low income housing from the ravages of preventable lead paint poisoning. Moreover, plaintiff asserts, it is only these residents who have a significant incentive to use the courts to obtain compliance with federal law or redress violations of the statute. Plaintiff contends that the lack of a meaningful alternative enforcement mechanism underscores that, unless enforceable by private action, the LBPPPA itself, and the congressional intent it expresses, will largely be reduced to empty promises. Plaintiff maintains that like the statutory provisions at issue in *Wright* and *Wilder*, § 4822(a)(1)(A) of the LBPPPA creates a specific "right" in identifiable persons or a specific class because it expressly identifies "purchasers and tenants" as persons entitled to receive information about the hazards of lead-based paint.

However, the *Gonzaga* Court made it clear that *Wright* and *Wilder* are limited to the particular statutory provisions at issue in those cases,[10] noted that subsequent cases had rejected attempts to infer rights from Spending Clause statutes, and rejected the notion that *Wright* and *Wilder* supported an argument that a person who merely *benefits* from a law has enforceable rights under § 1983. *Gonzaga*, 536 U.S. at 282-83.

Moreover, any cases premised upon a "benefits" analysis must be reexamined in light of *Gonzaga*.[11] The district court in the instant case correctly noted that the cases cited and relied on by plaintiff,[11] which have permitted a plaintiff to use § 1983 to sue for violations of the LBPPPA, "were all decided before *Gonzaga*," did not contain "a persuasive examination of the language and structure of the LBPPPA itself" or "an analysis which identifies the provisions of the statute that unambiguously confer a private right through clear rights-creating language," and were otherwise

---

[10]In *Wright,* which concerned a rent-ceiling provision of the USHA, 42 U.S.C. § 1437a, the Supreme Court allowed a § 1983 suit by public housing tenants to recover past overcharges, on the ground that the provision unambiguously conferred a mandatory benefit on the individual family by focusing on family income. 479 U.S. at 430. The *Gonzaga* Court explained that *Wright* was one of only two cases where the Court had found that spending legislation gave rise to enforceable rights, and "[t]he key to our inquiry [in *Wright*] was that Congress spoke in terms that 'could not be clearer[.]'" *Gonzaga*, 536 U.S. at 280 (quoting *Wright*, 479 U.S. at 430). A § 1983 action was likewise allowed in *Wilder,* which, like *Wright*, also involved legislation [a reimbursement provision of the Medicaid Act] that explicitly provided for an objective monetary entitlement to individual health care providers, with no sufficient alternative administrative means of enforcement. *Id.* at 280-81.

[11]*See Davis v. Philadelphia Hous. Auth.,* 121 F.3d 92 (3d Cir. 1997); *Perry v. Hous. Auth. of the City of Charleston*, 664 F.2d 1210 (4th Cir. 1981); *Aristil v. Hous. Auth. of Tampa, Fla.*, 54 F. Supp. 2d 1289 (M.D. Fla. 1999); *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537 (S.D.N.Y. 1995), *modified* 896 F. Supp. 1385 (S.D.N.Y. 1995); *Simmons v. Charleston Hous. Auth.,* 881 F. Supp. 225 (S.D. W.Va. 1995); *Hurt v. Philadelphia Hous. Auth.*, 806 F. Supp. 515 (E.D. Pa. 1992); *Paige v. Philadelphia Hous. Auth.*, No. 99-CV-497, 2002 WL 500677 (E.D. Pa. Mar. 28, 2002); *Elliot v. Chicago Hous. Auth. Inc.,* No. 98 C 6307, 1999 WL 519200 (N.D. Ill. July 14, 1999); and *N.Y. Coal. To End Lead Poisoning v. Koch,* 524 N.Y.S.2d 314 (N.Y. Sup. Ct. 1987), *aff'd* 526 N.Y.S.2d 918 (N.Y. App. Div. 1988).

distinguishable in the remedy allowed (limited to injunctive or declaratory relief). *Johnson*, 319 F. Supp. 2d at 769-70.

The LBPPPA bears the same characteristics, fatal to a § 1983 claim, as the statute (FERPA) in *Gonzaga* – it has an aggregate focus, it speaks in terms of institutional policy and procedure, and fails to confer the sort of individual entitlement that is enforceable under § 1983. Its provisions simply "lack the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights." *Gonzaga*, 536 U.S. at 287. The LBPPPA directs the Secretary of HUD to take action to abate as far as practicable lead hazards in targeted public housing funded by HUD. 42 U.S.C. § 4822. Designed to combat the health hazards occasioned by the presence of lead-based paint in older housing units, the Act is, in essence, a congressional directive to the Secretary of HUD to establish and implement procedures addressing such hazards.

Indeed, the provisions of the LBPPPA underscore the significant difference between "rights" and "benefits" in the context of post-*Gonzaga* § 1983 claims. The LBPPPA ultimately "benefits" plaintiff without expressly creating individual rights under the statute. The LBPPPA neither speaks to individual tenant entitlement nor is there a focus on the rights of tenants. Although the subsection regarding the distribution of informational pamphlets to purchasers and tenants unquestionably provides a trickle-down "benefit" to putative plaintiffs by providing information about the hazards of lead-based paint, this provision is neither directed to the individual tenant nor contains individually focused "rights-creating" language.[12] Rather, the text and overall structure of the statute focuses on the regulating entity's duties, which is too far removed from the interests of individual tenants to confer the kind of individual entitlement that is enforceable under § 1983 in accordance with *Gonzaga.*

We therefore conclude that the LBPPPA does not confer individual federal rights enforceable by plaintiff, as a tenant of federally funded Section 8 housing, under 42 U.S.C. § 1983, and affirm the district court's ruling in this regard.

In light of our conclusion that the LBPPPA does not evince a clear congressional intent to create an enforceable federal right, we also affirm the district court's dismissal of Count III of plaintiff's complaint,[13] which alleges an implied private cause of action under the LBPPPA. *See Gonzaga*, 536 U.S. at 286 ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.").

V.

Next, plaintiff alleges that defendants violated the USHA, 42 U.S.C. §§ 1437 and 1437f, by failing to provide decent, safe, and sanitary housing at the Jeffries Homes housing project. Plaintiff maintains that the district court erred in concluding that she has no enforceable § 1983 right of action under the pertinent portions of USHA.

Section 1437 provides in pertinent part:

(a) Declaration of policy

---

[12] Specifically, 42 U.S.C. § 4822 provides, in pertinent part, that "[t]he Secretary of [HUD] . . . shall establish procedures" and "such procedures shall require – . . . the provision of lead hazard pamphlets . . . to purchasers and tenants." *Id.* § 4822(a)(1)(A).

[13] *Johnson*, 319 F. Supp. 2d at 779 n.11.

It is the policy of the United States –

(1) to promote the general welfare of the Nation by employing the funds and credit of the Nation, as provided in this Act –

(A) to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families;

(B) to assist States and political subdivisions of States to address the shortage of housing affordable to low-income families; and

(C) consistent with the objectives of this subchapter, to vest in public housing agencies that perform well, the maximum amount of responsibility and flexibility in program administration, with appropriate accountability to public housing residents, localities, and the general public;

(2) that the Federal Government cannot through its direct action alone provide for the housing of every American citizen, or even a majority of its citizens, but it is the responsibility of the Government to promote and protect the independent and collective actions of private citizens to develop housing and strengthen their own neighborhoods;

(3) that the Federal Government should act where there is a serious need that private citizens or groups cannot or are not addressing responsibly; and

(4) that our Nation should promote the goal of providing decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments, and by the independent and collective actions of private citizens, organizations, and the private sector.

42 U.S.C. §1437(a)(1)-(4).

Again, we agree with the district court in this case that § 1437 comprises a congressional policy declaration which does not confer an enforceable right under § 1983. Evaluated in the context of *Gonzaga,* the language of § 1437 is devoid of "rights-creating" language; instead, the text merely presents broad policy statements regarding the federal government's goals in promoting "decent and affordable housing for all citizens through the efforts and encouragement of Federal, State, and local governments . . . ." 42 U.S.C. § 1437(a)(4).[14]

Section 1437f (Section 8), which addresses low-income housing assistance, is likewise devoid of rights-creating language. Pursuant to this statute,

The Secretary is authorized to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section. In areas where no public housing agency has been organized or where the Secretary determines that a public housing agency is unable to implement the

---

[14] In two cases decided prior to *Gonzaga,* other courts have likewise concluded that the policy statement set forth in § 1437 of the USHA does not create enforceable § 1983 rights. *See Howard v. Pierce*, 738 F.2d 722, 727 n.9 (6th Cir. 1984); *Perry*, 664 F.2d at 1213. In contrast, the Brooke Amendment, a separate provision of the USHA, has been held to create enforceable rights for families. *Wright*, 479 U.S. at 418; *see* Note 10, *supra*, and accompanying text.

provisions of this section, the Secretary is authorized to enter into such contracts and to perform the other functions assigned to a public housing agency by this section.

42 U.S.C. § 1437f(b)(1).

The remaining, extensive subsections of this statute set forth in detail the specific requirements of the annual contributions contracts.[15] Another section of the USHA, not relied on by plaintiff, requires that each annual contributions contract for a PHA shall require that the agency maintain its public housing in a condition that complies with certain housing quality standards that ensure that the public housing is "safe and habitable." *Id*. § 1437d(f)(2).

The district court concluded that:

Nothing in these provisions establishes a clear and unambiguous intent by Congress to create privately enforceable rights under § 1983 to ensure compliance with housing quality standards. The statutory provisions cited by Plaintiff focus on the Secretary of HUD's responsibilities and govern when assistance payments may be made to a public housing agency such as the DHC. The statute confers the authority on HUD to issue housing quality standards for public housing agencies to follow, but it does not contain language which unambiguously creates rights in Section 8 tenants.

Plaintiff essentially argues that the statutory language creates a federal right for Section 8 tenants in "safe and habitable" housing as reflected in the housing quality standards implemented for public housing agencies to follow. The residents of public housing undoubtedly benefit from the statutory provisions which condition the receipt of federal funds on the requirements to follow the housing quality standards. However, the statute focuses on regulating the Secretary and the public housing agencies through the Secretary's promulgation of housing quality standards. In other words, public housing authorities could make assistance payments only to the property owners who maintained housing units in accordance with the housing quality standards for decent and safe housing. This focus on the entity being regulated cuts against any intent to create rights enforceable by individual tenants.

*Johnson*, 319 F. Supp. 2d at 764. Again, we concur.

Plaintiff argues that the distinction drawn by the district court "is more ephemeral than real," and that, in truth, although the statutory language indisputably imposes a burden on the entity, it simultaneously creates a benefit for the family. According to plaintiff, the creation of a burden on one class is not inconsistent with, and does not detract from, the creation of a right of enforcement in the intended beneficiary; thus, this Court should reject the suggestion that Congress did not intend to permit the victims of USHA violations to vindicate the congressional requirements and policies by private action.

Plaintiff's argument is no longer meritorious in light of the *Gonzaga* decision. Although residents of public housing undoubtedly "benefit" from the statutory provisions at issue, the language of § 1437f has an aggregate focus on the entity being regulated, thereby belying any intent to create rights enforceable by individual tenants. The text of this portion of the USHA is "not concerned with 'whether the needs of any particular persons have been satisfied,'" *Gonzaga*, 536 U.S. at 288 (quoting *Blessing*, 520 U.S. at 343), and, thus, does not give rise to an individual

---

[15]Defendants acknowledge that the Jeffries Homes housing project is subject to Section 8.

entitlement enforceable under § 1983.  As previously noted, in the absence of specific "rights-creating" language, statutory text that merely benefits putative plaintiffs is insufficient to confer a new federal right under § 1983.  *Gonzaga*, 536 U.S. at 283.

Accordingly, for the reasons expressed by the district court in its well-reasoned opinion, we affirm the dismissal of plaintiff's § 1983 action filed pursuant to §§ 1437 and 1437f of the USHA for failure to state a claim upon which relief can be granted.

VI.

A related issue involves whether the regulations promulgated pursuant to the LBPPPA and the USHA can create enforceable rights of their own accord under § 1983.[16]  The district court, noting that we have previously held that federal regulations alone may create rights enforceable under § 1983, *Levin v. Childers,* 101 F.3d 44, 47 (6th Cir. 1996); *Loschiavo v. City of Dearborn*, 33 F.3d 548, 551 (6th Cir. 1994), reluctantly followed this precedent, but expressed its misgivings with these decisions, particularly in light of conflicting opinions on the issue from sister circuits and the recent Supreme Court decisions in *Gonzaga* and *Alexander. Johnson*, 319 F. Supp. 2d at 770-75.  The district court concluded that these latter two decisions, when read together, strengthen the reasoning, adopted by other circuits, that administrative regulations cannot create rights enforceable under § 1983 by their own force.  *Id*. at 776-79.  Nonetheless, bound by the precedent of *Levin* and *Loschiavo*, the district court looked to the federal regulations cited by plaintiff to determine if the regulations alone created enforceable rights and concluded that the pertinent regulations did not provide the clear intent to create federal rights in plaintiff's favor.  *Id.* at 775-79.

The district court did not have the benefit of this Court's recent decision in *Caswell v. City of Detroit Housing Commission*, wherein we concluded that the Supreme Court's decisions in *Alexander* and *Gonzaga* "have cabined *Loschiavo's* holding." 418 F.3d at 618.[17]

In *Caswell*, the former recipient of housing subsidies from the DHC filed a § 1983 action against the housing commission and its director, alleging an improper denial of subsidies.  The plaintiff alleged that the DHC violated a federal regulation by terminating his housing subsidies before his eviction proceeding was finalized in state court and while he continued to reside in the apartment.  We affirmed the district court's grant of summary judgment to the DHC on the plaintiff's regulatory violation claim, stating in pertinent part:

> In *Sandoval,* the Supreme Court held that there was no private cause of action to enforce Title VI regulations.  532 U.S. at 293.  The Court stated that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not . . . .  Agencies may play the sorcerer's apprentice but not the sorcerer himself."  *Id.* at 291 (internal citation omitted).  It is important to note, however, that the plaintiffs in *Sandoval* had not pursued a cause of action under § 1983; rather, the plaintiffs argued that an implied cause of action existed directly under Title VI and its accompanying regulations. .

---

[16]Plaintiff cites certain USHA housing quality standards and LBPPPA regulations in effect during the time period when Jerome lived with plaintiff in the Jeffries Homes, including, *inter alia*, 24 C.F.R. §§ 882.109, 882.116, 882.209, 882.222, and 24 C.F.R. §§ 35.20 & 35.24.

[17]In *Caswell,* we noted that, "[a]lthough a panel of this Court cannot overrule the decision of another panel, we may modify our prior holdings when an intervening opinion of the United States Supreme Court requires us to do so."  418 F.3d at 619 n.1 (citing *Salmi v. Sec'y of Health & Human Servs*., 774 F.2d 685, 689 (6th Cir. 1985)).

. . Nevertheless, the Court in *Gonzaga* shed further light on this issue by applying *Sandoval's* logic to § 1983 cases . . . .

* * *

Accordingly, when *Sandoval* and *Gonzaga* are read together, it becomes clear that in order for Caswell to bring a viable claim under § 1983, he must show that the right, of which he seeks vindication, is conferred by Congress in "clear and unambiguous terms." *Gonzaga*, 536 U.S. at 290 . . . .   The Court made clear in *Gonzaga* that where a statute simply prohibits certain conduct, or sets forth a policy, that statute does not create a cause of action or other rights for the individual protected by the statute.  *See* 536 U.S. at 287-288.

*Id*. at 618-19.  The *Caswell* Court concluded that "[b]ecause neither we nor Caswell can point to a specific statutory provision in the Housing Act that confers a right relevant to DHC's alleged violation of 24 C.F.R. § 982.311(b), Caswell cannot pursue his claim under § 1983."  *Id*. at 620.

In light of the *Caswell* decision, the rule expressed in *Loschiavo*, that a federal regulation alone may create a right enforceable through § 1983, is no longer viable.  Thus, in the instant case, because we conclude that the relevant provisions of the LBPPPA and the USHA do not confer personal federal rights upon plaintiff that are enforceable under § 1983, the federal regulations promulgated pursuant to these statutes are likewise incapable of independently conferring such rights.

VII.

For the foregoing reasons, we affirm the judgment of the district court.

---

### CONCURRING IN PART, DISSENTING IN PART

---

BOYCE F. MARTIN, JR., Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment.  I concur in the Court's analysis in sections I-V.  I disagree with the analysis in part VI, where the Court concludes that federal regulations cannot confer individual rights, and I believe that this Court is still bound by our decision in *Loschiavo v. City of Dearborn*, 33 F.3d 548 (6th Cir. 1994) (Martin, J.), holding just the opposite.  I would find that the specific regulations at issue in this case, however, do not confer individual rights enforceable under Section 1983, and therefore, concur in the result in part VI.

### I.

The majority's error in part VI is its failure to distinguish between individual rights and private rights of action.  *See Save Our Valley v. Sound Transit*, 335 F.3d 932, 946 (9th Cir. 2003) (Berzon, J., dissenting in part).  This error leads to the incorrect conclusion that federal regulations may never create rights enforceable under 42 U.S.C. § 1983.  Maj. Op. at 13.  The key point is that a "right" is not the same as the ability to enforce that right in court.  *See Save Our Valley*, 335 F.3d at 951 (Berzon, J., dissenting in part) ("Any analysis of the reach of § 1983 must therefore begin with, and not lose sight of, the unexceptional proposition that rights are entirely distinct from any private, affirmative, judicial remedy that may exist for violation or deprivation of those rights.").

The majority reaches this conclusion by reading too much into *Alexander v. Sandoval*, 532 U.S. 275 (2001), which was an implied right of action case.  In such a case, the first inquiry is whether the statute confers a right, and second, whether "permitting a private remedy to vindicate that right is consistent with Congress' intent in enacting the statute." *Save Our Valley*, 335 F.3d at 952 (Berzon, J., dissenting in part).  Failure on the part of the plaintiffs to identify either the *right* or the *remedy* is fatal.[1]  "Section 1983, in contrast, indisputably *does* create a right of action." *Id.* (emphasis in original).  Thus, the primary question in a Section 1983 action is whether there is a federal *right*.  *Id.* at 953 ("So, when a cause of action that otherwise meets the requirements of § 1983 is at issue, our task is simply to determine whether the regulation in question is the type of legal prescript that Congress meant to be enforceable under § 1983.").

The majority's reading of *Gonzaga* is likewise overbroad.  *Gonzaga* "held only that the *initial* inquiry in § 1983 cases and in implied right of action cases [such as *Sandoval*] is the same inquiry: whether the law at issue creates an individual right." *Id.* at 954.  Moreover, the plaintiff in *Gonzaga* argued that the right he sought to enforce was a *statutory* right, and therefore, it is no

---

[1] The Supreme Court focused on this question in *Sandoval* — that is, whether a private remedy to enforce the right was intended by Congress.  The Court did not address the first question as to whether the regulation independently created a right.  Having concluded that Congress did not intend a private *remedy*, the natural conclusion was that the regulations themselves could not themselves create such a remedy.  Finding no *private remedy*, of course, does not mean that the Court found no individual *right*.  As Judge Berzon noted in her dissenting opinion in *Save Our Valley*, it was "in this context that the Court wrote that: 'Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not . . . [I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.  Agencies may play the sorcerer's apprentice, but not the sorcerer himself.'" 335 F.3d at 953 (Berzon, J., dissenting in part) (quoting *Sandoval*, 532 U.S. at 291).  The Court's sorcerer analogy was not addressing whether a regulation can independently create a right.  "In other words, only Congress may provide access to the federal courts, and thus only Congressional intent is relevant in determining whether to imply a right of action," but "[t]he special separation of powers concerns underlying *Sandoval* do not apply in a § 1983 case." *Id.*

surprise that the Supreme Court stressed Congressional intent.  *Gonzaga*, however, "neither raised nor discussed . . . whether a particular type of law *can* create a right."  *Id.*

Consequently, neither *Sandoval* or *Gonzaga* — which address implied private rights of action and *not* the issue of whether regulations can create *rights* — provide a basis for a panel to overrule a prior panel decision of this Court.  The majority notes that in *Caswell v. City of Detroit Housing Commission*, 418 F.3d 615, 619 n. 1 (6th Cir. 2005), we stated that "[a]lthough a panel of this Court cannot overrule the decision of another panel, we may modify our holdings when an intervening opinion of the United States Supreme Court requires us to do so."  Based on this authority, the panel asserted that *Sandoval* and *Gonzaga* "have cabined *Loschiavo*'s holding."  *Id.* at 618.  I disagree.  There was nothing in *Sandoval* or *Gonzaga* that *required* us to overrule our previous decision in *Loschiavo*, as the majority and all other courts to have reviewed such questions agree, neither case was directly on point.  I would continue to adhere to our decision in *Loschiavo*, and the D.C. Circuit's holding in *Samuels v. District of Columbia*, 770 F.2d 184 (D.C. Cir. 1985), because of *stare decisis* and also because it reaches the correct conclusion.

First, regulations have the same characteristics as statutes; they are binding on individuals *and* the government, and contain the same prospective form and effect as statutes.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 301-04, 308 (1979) (holding that a regulation may have "the force and effect of law" if: (1) it enacts substantive rules affecting individual rights and obligations, and is not merely an interpretive rule or general policy statement; (2) Congress has delegated "quasi-legislative" power to the agency; and (3) the regulation is valid, *i.e.*, the agency has followed applicable procedures such as the Administrative Procedure Act).  I therefore agree with Judge Berzon, that there is "no reason why valid agency regulations cannot create individual rights and do so independently of specific Congressional intent regarding the rights created."  *Id.*

This Court and other courts have consistently treated legislative regulations as having the force of law.  *Loschiavo*, 33 F.3d at 551 (noting that "federal regulations have the force of law"); *Wachovia Bank v. Watters*, 431 F.3d 556, 560 n.2 (6th Cir. 2005) (quoting *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) to the effect that "[f]ederal regulations have no less pre-emptive effect than federal statutes")[2]; *see also United States v. Booker*, 543 U.S. 220, 243 (2005) (citing *Mistretta v. United States*, 488 U.S. 361 (1989) and noting that the Sentencing Commission "was more properly thought of as exercising some sort of legislative power" delegated to it by Congress); *Save Our Valley*, 335 F.3d at 955 (Berzon, J., dissenting in part) ("Regulations thus have the same form and same effect, and are based on the same types of considerations, as statutes.").  And, Title 42 U.S.C. § 1983 was "intended to provide a remedy, to be broadly construed, against all forms of official violation of federally protected *rights*."  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 700-701 (1978) (emphasis added).  For these reasons, there is no difference between a regulation and a statute that would justify the majority's conclusion in part VI that regulations cannot independently create *rights*.

Second, the idea that federal regulations cannot create rights "flies in the face of seventy years of administrative law jurisprudence."  *Save Our Valley*, 335 F.3d at 954 (Berzon, J., dissenting in part).  This conclusion is overly formalistic and simply ignores the dynamic that exists between Congress and administrative agencies in the modern world.  The Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law."  *Whitman v. Am. Trucking Ass'n, Inc.*, 531 U.S. 457, 474-75 (2001) (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)).  In reality, the Supreme

---

[2] Additionally, agencies preempt state law by enacting regulations "necessary to ensure the achievement of the (agency's) statutory responsibilities," regardless of whether the agency's authorizing statute explicitly gives the agency the power to preempt conflicting state laws.  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699-700 (1984) (citation omitted).

Court has permitted Congress tremendously broad authority to delegate legislative power to administrative agencies and these agencies do more than merely interpret that delegation. *See Mistretta*, 488 U.S. at 372 (noting that "our jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives"); *Loving v. United States*, 517 U.S. 748, 758 (1996) ("This Court established long ago that Congress must be permitted to delegate to others at least some authority that it could exercise itself.").

Consequently, "Congress may choose not to legislate specifically in a particular area but instead leave it to the agency to fill out the area with regulations." *Save Our Valley*, 335 F.3d at 958 (Berzon, J., dissenting in part) (citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-44 (1984)). When this situation occurs, the administrative agency acts much like a legislature. *Id.* Regardless of whether a regulation merely defines or fleshes out an already explicit statutory right or enacts a *valid* regulation that creates the right within the power delegated by Congress, I see nothing that would preclude using the remedy of Section 1983 to enforce that right. The distinction the majority and other courts have drawn between regulations and statutes is, for purposes of determining whether a *right* exists, more illusory than real. I agree with Judge Berzon's assessment that

> just as regulations may create new obligations, not specifically intended by Congress, within the sphere properly delegated to the promulgating agency, I can see nothing in the administrative law principles governing legislative regulations that precludes promulgation of the particular form of rules that we describe as creating "rights." Such rights-creating regulations, like other valid legislative regulations, have the force and effect of laws and are binding on individuals regulated, the courts and the agency itself.

*Id.* at 959 (Berzon, J., dissenting in part). For "regulations, if valid and reasonable, authoritatively construe the statute itself." *Sandoval*, 532 U.S. at 284. Furthermore, the question of whether "regulations alone" may create a federal right is itself misleading. Regulations do not exist "alone" and of their own accord. To be a valid exercise of federal executive power, the regulation must be based on some permissible interpretation of congressionally delegated authority. Thus, the question is whether valid regulations, having the force and effect of law, can satisfy the *Blessing v. Freestone*, 520 U.S. 329 (1997) test when the less specific statute by itself may not. It seems odd to conclude that *valid* regulations — that is, regulations enacted pursuant to congressionally delegated authority — cannot function as Congress so delegated. To conclude that rights cannot be created by valid regulations implicitly (and wrongly) concludes that valid regulations are somehow not truly valid interpretations of Congress's intent. Thus, I would conclude that regulations have the same force of law and effect as statutes and therefore, *may*, just as statutes *may*, create *rights* enforceable under the *remedy* of Section 1983.

## II.

The inquiry under *Blessing* and *Gonzaga* is equally applicable for determining whether language in a regulation creates a right. If we were to conclude that the regulations at issue in this case create a right, then they would be enforceable under Section 1983. This is contrary to the majority's conclusion that regulations can *never* create a right. In this case, however, I would conclude that the regulations at issue do not create a right. Finding no right, there is nothing to enforce under Section 1983. Therefore, with respect to these regulations, I agree with the result reached by the majority.